Philip D. THOMPSON, Plaintiff,

v.

TUALATIN HILLS PARK AND RECRE-
ATION DISTRICT, Defendant.

Civ. No. 78–642.

United States District Court,
D. Oregon.

July 28, 1980.

George M. Galloway, Andrew R. Gardner, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for plaintiff.

Donald Joe Willis, Schwabe, Williamson, Wyatt, Moore & Roberts, John L. Schwabe, Portland, Or., Rodney C. Adams, Thompson, Adams & DeBast, Beaverton, Or., for defendant.

## OPINION

DAVID S. PORTER, Senior District Judge: *

Plaintiff, Philip D. Thompson ["Thompson"] brought this inverse condemnation action against the Tualatin Hills Park and Recreation District ["the District"] to recover damages of $58,846 for an alleged taking of Thompson's property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and Article I Section 18 and Article XI Section 4 of the Constitution of Oregon.

Specifically, Thompson complains that the District's filing of an eminent domain action to obtain property owned by him caused him to forego an option to purchase land that could have provided a roadway into his property and allowed subdivision of his property into 21 lots for single–family homes. Thompson contends that the loss of this option significantly and permanently lowered the value of his property.

This matter was tried to the Court on April 3 and 4, 1980. We have considered the testimony, exhibits, and arguments presented at trial and have reached the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The property that is the subject of this lawsuit consists of two adjacent parcels of land in eastern Washington County, Oregon. One of the parcels, Tax Lot 400 on Map 1S1–12AD, has northern and southern boundary lines about 20 feet in length and eastern and western boundary lines about 325 feet in length; it has an area of approximately .15 acres. The north end of Tax Lot 400 abuts a public roadway named Southwest Canyon Drive. The other parcel, Tax Lot 200 on Map 1S1–12AD, is nearly square in shape, with sides about 615 feet in length; it has an area of approximately 7.76 acres. The western boundary of Tax Lot 200 abuts the eastern boundary of Tax Lot 400. The common boundary between the two parcels is about 185 feet long. The northwest corner of Tax Lot 200 is about 140 feet south of Southwest Canyon Drive. About 275 feet south of Tax Lot 200 is the northern end of a public roadway named Southwest 66th Avenue. A diagram indicating the relative locations of the subject property and the roadways is set out in the appendix to this opinion.

At the time of the events that gave rise to this lawsuit Thompson either had an option to purchase or had title to all of Tax Lot 200 and an undivided half–interest in Tax Lot 400. Tax Lot 400 was subject to a deed covenant that allowed any person in lawful possession of it to use it for a private roadway to adjacent property (dx 171, ¶ 5).

---

* Honorable David S. Porter, United States Senior District Judge for the Southern District of Ohio, sitting by designation in the District of Oregon.

The subject property is in a suburban area about six miles west of downtown Portland, Oregon. It is wooded and steeply sloping land which was undeveloped at the time of the events complained of in this lawsuit (px 25, pp. 6–7).

The area is subject to Washington County land use regulations and is zoned for residential housing, up to six units in a building, with minimum lot sizes of 10,000 square feet. Current land use regulations also allow use of residential "planned unit developments" on parcels in excess of two acres. Such developments are allowed to vary from structure and lot size requirements within a particular zone (dx 111, part titled "Cartozian p. u. d." pp. 1–5).

Thompson first became interested in the subject property in 1973 while working as an architectural and land use planning consultant for a Portland–based real estate development firm, Leavitt Brothers Co. ["Leavitt"].[1] At that time Leavitt held an option to purchase the subject property and was making development proposals for it and an adjacent parcel to the south which had flatter terrain. Title to the subject property was held in trust by the Bank of California, N.A.; Leavitt owned the southerly parcel. By May, 1974 Leavitt was able to win approval only for its development plans for the southerly parcel. The plans for the subject parcel were abandoned (dx 111, part titled "previous studies for the property"; dx 112–115).

In April, 1975 Thompson obtained an option to purchase the subject property from the Bank of California, N.A. for $30,000 (dx 116). Thompson secured the option with a personal note for $500; it ran for six months. It was renewable for an additional six months for another $500.

In June of 1975 Thompson presented a development plan for the subject property to the Washington County Planning Commission and the Washington County Board of Adjustment. The plan called for a 12–unit townhouse–style condominium devel-

opment on the northern part of the parcel with street access to the north by way of 20–foot–wide private road to Southwest Canyon Drive. This private road would be on Tax Lot 400. In order to implement this plan Thompson needed a planned unit development designation for the site because it would involve a building with more than six units. He also needed a variance from the requirement that 50–foot–wide access roads be used for this type of project.

The Planning Commission denied plaintiff's application for a planned unit development designation on July 8, 1975. The Board of Adjustment approved the variance from the 50–foot–wide standard on November 10, 1975. Both matters were reviewed by the Washington County Board of Commissioners which upheld the decisions of the Commission and Board on February 3, 1976 (dx 101, 102). The result then of Thompson's first development proposal was that his 12–unit condominium project was not approved but he could build a 20–foot–wide private access road on Tax Lot 400.

Through the application and review process Thompson became impressed that the only type of development that would be approved for the subject property was single–family housing. In mid–February, 1976, he submitted a proposal to the Planning Commission for an 18–*lot* subdivision of the subject property that would permit only single–family houses. *See* dx 103, 180. Access to all but one of the lots would be by way of an extension of Southwest 66th Avenue from the south that would end in a cul–de–sac on Tax Lot 200. This road would be on a 50–foot–wide right–of–way that would be dedicated to the public. Access to the remaining lot, which Thompson intended to use for his own home, would be by way of the already–approved 20–foot–wide private road going to Southwest Canyon Drive.

In order to achieve the desired extension of Southwest 66th Avenue onto the subject property Thompson had to make arrange-

---

1. During the period relevant to this lawsuit Leavitt Brothers Co. became a subsidiary of Equitable Savings and Loan of Portland and changed its name to Leavitt Nupacific. It will be referred to in this opinion as "Leavitt."

ments to have the street traverse parts of two undeveloped lots just south of the subject property. Those lots were then owned by Leavitt and were part of the southerly parcel adjacent to the subject property that Leavitt had received development approval for in 1974. At the time Thompson presented his 18–lot plan, Southwest 66th Avenue dead–ended in a cul–de–sac about 260 feet south of the subject property (dx 100, part titled "Raleighview II Final Master Plan").

In February, 1976 Thompson paid Leavitt $500 for an option to purchase the land necessary for the extension of Southwest 66th Avenue up to the subject parcel. The option agreement permitted Thompson to purchase designated portions of Leavitt's lots 44 and 46 for the purpose of constructing a dedicated street. The cost of the land designated was to be the $500 note plaintiff had already tendered. The agreement was subject to a number of conditions: (1) Thompson could cancel the agreement within 30 days and receive his $500 back if his feasibility studies were unsatisfactory; (2) Leavitt could cancel the agreement within 60 days of Thompson's acceptance; (3) if Leavitt chose to cancel the agreement Thompson could purchase a designated part of Lot 46 and all of Lot 44 for a total purchase price of $13,500 so long as Thompson paid the total purchase price within 60 days of Leavitt's cancellation of the agreement. The agreement was signed by Thompson on February 20 and by Leavitt on February 25 (px 22; dx 126). See diagram in the appendix to this opinion.

By an agreement signed by Thompson on February 21 and by Leavitt on February 24, Leavitt obtained an option to purchase for $65,000 "approximately 20" of the lots plaintiff planned to subdivide the subject property into (dx 127). The lot Thompson intended to use for his own home was excepted from the option (dx 128). This option was secured by Leavitt's $1,000 note. The option was conditioned upon Thompson's obtaining approvals so the lots could be built on.

Neither Thompson's option to purchase the access parcel nor Leavitt's option to purchase most of the subject property was recorded with the Washington County Registrar of Deeds.

On April 7, 1976 Thompson had a pre–application conference with the staff of the Washington County Planning Commission (dx 130) to discuss his subdivision plans for the subject property.

On about April 16, 1976 Thompson formally closed the purchase of the subject property from The Bank of California. The total price was $30,000. Thompson had already paid $1000. The balance of the purchase price came from two mortgage loans both requiring payment in full in two years. One loan, for $10,000, was from The Bank of California; the other loan, for $19,000, was from Gilco Partnership (dx 116, 125).

In a letter dated April 30, 1976 and received by Thompson on May 3, 1976 the District's attorney informed Thompson that the District intended to acquire the subject property. An offer of $50,000 was extended. The letter stated that the District would institute condemnation proceedings in 20 days if the acquisition could not be negotiated (px 10).

In a letter to Leavitt dated May 1, 1976, Thompson attempted to exercise his option to purchase portions of Leavitt's Lots 46 and 44 for use as an access road. The parcel designated in Thompson's May 1 letter was, however, different from the parcel designated in the option agreement. Compare px 22 with px 4. The parcel designated in the letter took less land from Lot 44.

On May 20, 1976 Thompson submitted a preliminary subdivision plat for the subject property to Washington County Fire District No. 1 (dx 140). This submission was made in order to gain the Fire District's approval of the street design for the subdivision. The plat showed a subdivision of the subject property into 21 lots. Conditional approval was given on May 24, 1976 (dx 140).

On May 21, 1976 the District filed a condemnation action against Thompson and

other holders of interests in the subject property. The action was filed in the Oregon Circuit Court for Washington County (dx 106). The complaint stated that the land was necessary for park purposes and that purchase negotiations had been unsuccessful. The value of the parcel was alleged to be not more than $50,000.

On June 3, 1976 Thompson notified Leavitt that he had received notice of the condemnation action and that the feasibility of purchasing the access parcel was affected. Plaintiff suggested that Leavitt reassess its position that Lot 44 would not be adversely affected by plaintiff's exercise of the option. On June 3 Thompson also wrote to the Washington County Planning Commission staff informing them that litigation against the subject property was pending and asking that further action on his subdivision proposal be suspended (dx 148).

In a letter dated June 11, 1976 Leavitt responded to Thompson's June 3 letter (dx 151). In its letter Leavitt said that condemnation of the subject property would negate Thompson's option to purchase portions of Lots 44 and 46. Such negation, the letter concluded, would allow plaintiff to purchase Lot 44 at the purchase price stated in the option agreement.

On June 28, 1976 Thompson filed an answer to the condemnation complaint (dx 106). All allegations of the complaint were admitted except the allegation of value. The answer alleged as an affirmative defense that the fair market value of the subject property was $125,000.

On June 12, 1976 Leavitt sent Thompson a letter by certified mail stating that the option agreement for purchase of the access parcel was cancelled (px 13). The letter stated that the pending condemnation action was affecting sales of lots in Leavitt's subdivision because potential buyers are unsure about the proposed street dedication. Mary Lou Carrin, Vice President of Leavitt, testified at trial that after the option for the access parcel was cancelled plaintiff could still have purchased Lot 44 and a portion of Lot 46 as stated in the option agreement, at least until mid–July, 1976.

Thompson testified that he decided not to purchase Lot 44 and part of Lot 46 as provided in the agreement because, once the condemnation was completed, it would have no value as an access parcel and he did not think it would be a good value for purposes of building on, and because he had been advised by legal counsel that he should not take actions that would increase the value of the subject property while the condemnation action was pending.

On October 29, 1976, apparently in response to a phone call from an employee of Leavitt, Thompson returned the $1,000 note Leavitt had given him for the option to purchase the subject property (dx 154A). On November 1, 1976 Leavitt returned the $500 note Thompson had tendered for the access parcel option (dx 154B).

On June 8, 1977, the District filed a motion to dismiss its condemnation action (dx 106). The motion was accompanied by an affidavit signed by the general manager of the District stating that the District had elected to abandon the condemnation action involving the subject property.

The District's good faith in initiating and abandoning the condemnation has not been challenged by Thompson in this case. The District's counsel has represented to the Court that the District was responding to a request by a neighborhood group in designating the subject property for acquisition. The eastern part of Washington County is heavily developed and park sites are needed but difficult to locate. In reaching its decision to abandon the District considered four factors. First, the topography of the subject property and the limited access to it created substantial difficulties for its development as a recreation area. Second, an appraisal opinion obtained by the District indicated the subject property was worth $75,000, which was more than the District had anticipated. Third, another condemnation case the District had filed was tried in the winter of 1977 and the judgment given to the property owner was shockingly large. Finally, the District had experienced substantial cost overruns on renovation projects. These factors caused the District

to reassess its need for the subject property and its ability to pay for it.

Sometime after the dismissal motion was filed Thompson filed a motion in objection to dismissal. The motion apparently made the same claim that is made in this case, that is, that the District's initiation of the condemnation suit caused him to lose his option to acquire the access parcel and thereby caused the subject property to lose market value. A hearing on both the motion to dismiss the condemnation and the motion in opposition was held before Judge Milnes on July 5, 1977. A partial transcript of that hearing (px 20) shows Judge Milnes considered Thompson's claim an inappropriate one in that it was not raised in his answer to the condemnation complaint and, apparently, could not be subsequently raised under Oregon pleading rules. Judge Milnes suggested that the proper vehicle for Thompson's claim was a separate lawsuit. Thompson filed a memorandum in support of his motion on July 19, 1977. On July 22, 1977 Judge Milnes filed an order directing that the condemnation be dismissed with prejudice and that a hearing be set for determination of costs and attorney fees pursuant to Ore.Rev.Stat. 35.335. On August 5, 1977 Judge Milnes filed an order stating that Thompson's motion in objection was denied and that the hearing to be held on costs and attorney fees would not include Thompson's claim of damages. The August 5 order also included a finding that Thompson would have to initiate separate proceedings for his claim of damages for loss of market value.

Thompson's cost bill was filed July 18, 1977. It claimed expenses of $20,098.95 for filing and prevailing fees, expert witness fees, and attorney's fees. In an order filed September 12, 1977 Judge Milnes found Thompson's costs to be $13,386.93 for the various fees claimed. A judgment award-

ing Thompson $13,346.95 was filed on September 26, 1977 and a satisfaction of that judgment was filed on October 21, 1977 (dx 106).[2]

Following the dismissal of the condemnation action Thompson contacted Leavitt and inquired about purchasing either the access parcel or all of Lot 44. Leavitt informed him that Lot 44 had been sold and that a house would be built on it. Thompson investigated other access possibilities but was unsuccessful. See dx 163. The only access available was the northerly 20-foot-wide access strip to Southwest Canyon Drive. Plaintiff estimated that this access would allow development of only four or five single-family homes.

In September, 1977 Thompson contracted to sell, and in January, 1978 did sell the subject property to Lawrence and Gayle Rosencrantz for $85,000. The Rosencrantzes obtained approvals for subdivision of the subject property into four lots for single-family homes. At the time of trial two houses had been completed on the subject property.

The value of the subject property was greatly contested between the parties to this action. Conflicting expert testimony was presented, making the Court's task as finder of fact very difficult. It is made more difficult by the necessity of finding different values for the subject property at different times because of the claim that the presence or absence of southerly access affected value significantly.

A number of factors affecting value should be recognized explicitly. First, during the time of the events that are the subject of this suit, real estate values in the areas near the subject property were increasing at an annual rate of 15 percent. Experts testifying for both sides acknowledged this.

2. Thompson filed an affidavit in support of his motion in opposition on September 10, 1977. The affidavit stated that the condemnation action foreclosed the subdivision of the subject property unless variances or zoning changes are made. The District filed a motion to strike the affidavit on September 28, 1977, complaining that Thompson's motion in opposition had been denied after the condemnation case had been dismissed. A hearing was held on October 17, 1977 and Circuit Judge Glen Hiebler granted the motion to strike on October 27, 1977 (dx 106).

Second, it was likely that Thompson could have extensively subdivided the subject property if he had obtained the access parcel. His plans were within existing zoning requirements and he was in the process of gaining approvals. In a report he made to the District for condemnation purposes, appraiser Harold Meyer, who appeared as an expert witness for the District at trial, acknowledged that with southerly access it was likely that the subject parcel could be subdivided into 15 to 18 lots (px 9, 34). Such a subdivision would undoubtedly make the subject property more valuable than it would be subdivided into the four or five lots the established northerly access would allow.

Finally, extensively subdividing the subject property would have required relatively high development costs because of the steep terrain and the difficulty of accessing the lots with roadways and public utilities.

As noted above, Thompson contracted to sell the subject property to the Rosencrantzes in September, 1977 for $85,000. This is perhaps the best possible evidence of what a willing buyer would pay a willing seller. We will use this as a benchmark figure for what the subject property was worth without the southerly access. Expert testimony conflicted greatly as to what the value of the subject property would have been in September, 1977 if the southerly access was available. Considering the evidence as to sales of comparable properties and the factors discussed above, we find that in September, 1977 the subject property with southerly access would have been worth $15,000 an acre. The subject property consists of 7.91 acres, so its total value at that time calculates to $118,650. This figure will also be used as a benchmark.

Using these benchmark figures and the 15 percent rate of annual increase of real estate values, we calculate the following values for other dates important to this case. In June, 1977, when the District informed Thompson that it was abandoning the condemnation action, the value of the subject property with southerly access was $112,717 and without southerly access was $80,750. In July, 1976, when the access parcel was no longer available to Thompson, the value of the subject property with southerly access was $96,996 and without southerly access was $69,062. In May, 1976 when the District initiated the condemnation action the value of the subject property with southerly access was $93,437, and without southerly access was $66,937.

## CONCLUSIONS OF LAW

### I

Before discussing the merits of plaintiff's constitutional claims we will deal with four subsidiary issues raised by the defendant.

■ First, defendant contends this Court is without subject matter jurisdiction over this action. We hold that this Court has subject matter jurisdiction over the claims based on the United States Constitution pursuant to 28 U.S.C. § 1331(a) in that the amount in controversy exceeds $10,000 and, as discussed below, the right plaintiff seeks to enforce will be supported if the Constitution is given one construction and will be defeated if given a different construction. *Foster v. Herley*, 330 F.2d 87, 91 (6th Cir. 1964); *see Richmond Elks v. Richmond Development Agency*, 561 F.2d 1327 (9th Cir. 1977); *see also Monell v. Dept. of Social Services*, 436 U.S. 658, 721 n.4, 98 S.Ct. 2018, 2051 n.4, 56 L.Ed.2d 611 (1978) (J. Rehnquist dissenting); *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977).[3] Since plaintiff has presented a substantial federal issue and has alleged the same facts constitute a violation of the Oregon Constitution, this Court also has subject matter jurisdic-

---

3. We note without deciding that Thompson could have invoked 42 U.S.C. § 1983 to create a federal cause of action in that the action alleg-to be unconstitutional implemented a decision of a local government body. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). This Court's subject matter jurisdiction could then have been established pursuant to 28 U.S.C. § 1343. *See Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 278–279, 97 S.Ct. 568, 571–572, 50 L.Ed.2d 471 (1977).

tion over plaintiff's appended state claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

■ Second, defendant claims plaintiff is barred by the doctrine of res judicata from bringing any claim in this Court. We hold that the determination of the condemnation proceeding in the Oregon Circuit Court for Washington County in no way bars our determination of the merits of plaintiff's inverse condemnation claim. We are of course required to give state court judgments full faith and credit. 28 U.S.C. § 1738. The decision of Circuit Court Judge Milnes, however, specifically excepted any determination of plaintiff's inverse condemnation cause of action. The merits of this claim may have been litigated, but they were not decided. Hence, we are not barred by the full faith and credit statute from reaching the merits of this claim. Further, that plaintiff took a judgment in the condemnation proceeding has no bearing on this claim for that judgment was specifically limited to costs and attorney. fees incurred in the condemnation proceeding. *See generally* 1B Moore's Federal Practice ¶ 0.405 (1974).

■ Third, defendant argues that plaintiff has not joined necessary parties pursuant to Fed.R.Civ.P. 19(a). Specifically, defendant suggests that the mortgagees of the subject property while plaintiff owned it, Bank of California and Gilco Partnership, and the co–owner of Tax Lot 400 should have been joined as parties. We hold that joinder of these persons was not necessary. Since the mortgagees' interests were for specific amounts–amounts which were probably repaid when plaintiff sold the property–their interests would be unaffected by any judgment in this case. The interest of the co–owner of Tax Lot 400 would also be unaffected because of the deed covenant allowing its use as a private roadway would remain regardless of the outcome of this case and that is the only use that anyone has contemplated for that parcel. *See* Wright & Miller, *Federal Practice & Procedure* : Civil § 1621 (1972). Com-

plete relief can be accorded between plaintiff and defendant without the presence of the mortgagees or co–owner. Their absence from this suit will not impair their ability to protect their interests–if any remain–nor will it create any difference in the obligations of the existing parties that may stem from this action that would not otherwise exist. *See* Wright & Miller, *supra,* § 1602.

■ Finally, defendant asserts that plaintiff is barred from bringing this action because he sold the subject property prior to filing this lawsuit and therefore has no property interest to convey if he obtains a judgment. We hold that plaintiff may bring this action even though defendant cannot obtain any property right if inverse condemnation is found. In inverse condemnation actions it is not necessary that there be a conveyance to the state, nor that the judgment provide for appropriation by the state. *Tomasek v. Oregon Highway Com'n,* 196 Or. 120, 152, 248 P.2d 703, 717–18 (1952). *See United States v. General Motors,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945); *Foster v. Herley,* 330 F.2d at 89; *see also Klopping v. City of Whittier,* 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972).

## II

Plaintiff's inverse condemnation claim is based upon the Fifth and Fourteenth Amendments to the United States Constitution, and Article I Section 18 and Article XI Section 4 of the Oregon Constitution. The Fifth Amendment provides, in part, that "private property [shall not] be taken for public use, without just compensation." This provision is applied to the activities of states and their subdivisions by the due process clause of the Fourteenth Amendment. *Chicago, B. & Q. Ry. Co. v. Chicago,* 166 U.S. 226, 235–241, 17 S.Ct. 581, 584–586, 41 L.Ed. 979 (1897); *see Malloy v. Hogan,* 378 U.S. 1, 4, 84 S.Ct. 1489, 1491, 12 L.Ed.2d 653 (1964); *Gideon v. Wainwright,* 372 U.S. 335, 341–342, 83 S.Ct. 792, 794–795, 9 L.Ed.2d 799 (1963). Article I Section 18 of the Oregon Constitution has language vir-

tually identical to that of the Fifth Amendment and has been construed by the Oregon Supreme Court to have the same meaning as that of the Fifth Amendment. *Lincoln Loan v. State Hwy Comm.*, 274 Or. 49, 52 n. 2, 545 P.2d 105, 106 n. 1 (1976). Article XI Section 4 of the Oregon Constitution states: "No person's property shall be taken by any corporation under authority of law, without compensation being first made, or secured in such a manner as may be prescribed by law." This section, which apparently limits condemnation authority delegated to public and private corporations, has been construed by the Oregon Supreme Court to have the same meaning as Article I Section 18 of the Oregon Constitution and the Fourteenth Amendment to the United States Constitution. *MacVeagh v. Multnomah County*, 126 Or. 417, 270 P. 502 (1927). Since all constitutional provisions relied on by plaintiff are analogous in language and meaning, we will consider them as providing a single standard for our determination of plaintiff's claims.

The term "inverse condemnation" is used to describe a cause of action against a governmental entity to recover the value of property taken by the entity even though no formal exercise of the power of eminent domain has been completed. *Thornburg v. Port of Portland*, 233 Or. 178, 180 n. 1, 376 P.2d 100, 101 n. 1 (1963); *Levine v. City of New Haven*, 30 Conn.Supp. 13, 14, 294 A.2d 644, 645 (1972); Sackman, "Factors in Inverse Condemnation," *Institute on Planning, Zoning, and Eminent Domain* 369 (1978) [hereafter referred to as "Sackman–1978"]. Inverse condemnation actions can be grouped into two broad categories, those alleging that particular government–imposed land use regulations are unduly restrictive[4] and those claiming that certain government activities, such as operating an airport[5] or pursuing an urban renewal project,[6] substantially interfere with use and enjoyment of property. The case at bar is akin to the latter category, for the District was engaged in the activity of procuring lands for parks when it initiated condemnation proceedings against Thompson.

A substantial body of case law recognizing constitutional claims arising out of protracted and abandoned condemnation proceedings has developed during the last decade and a half. *See generally* Sackman– 1978, *supra*; Sackman, "Condemnation Blight–Part II," *Institute on Planning, Zoning and Eminent Domain* 283 (1976) [hereafter referred to as "Sackman–1976"]; 4 *Nichols on Eminent Domain* § 12.3151[5] nn. 54, 55 and accompanying text (Rev. 3d Ed. 1979). Prior to this development the general rule was that absent a statute imposing liability on a condemnor, damages suffered by a landowner as a result of condemnation proceedings that were protracted or subsequently abandoned were *damnum absque injuria*, that is, damages for which no legal recourse exists. Annot., 92 A.L.R.2d 355, §§ 5, 6, 7 (1963). The trend away from the *damnum absque injuria* principle was initiated in cases, commonly known as "condemnation blight" cases, in which properties designated for condemnation suffered drastic physical deterioration and depreciation in value before the formal appropriation. In these cases courts found either that the actual ("de facto") taking of the property occurred at a date prior to the statutorily recognized time of transfer or that loss of income and other damages incidental to the condemnation process could be included in the condemnation award. *See Klopping v. City of Whittier, supra*; *Luber v. Milwaukee County*, 47 Wis.2d 271, 177 N.W.2d 380 (1970). The basis for these findings is that the "just compensation" clauses of the United States Constitution and the consti-

---

4. *See, e. g., Agins v. City of Tiburon,* —— U.S. —— , 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Arastra Limited Partnership v. City of Palo Alto*, 401 F.Supp. 962 (1975).

5. *See, e. g., Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962); *Alevizos v. Metropolitan Airports Commission*, 298 Minn. 471, 216 N.W.2d 651 (1974).

6. *See, e. g., Sayre v. City of Cleveland*, 493 F.2d 64 (6th Cir. 1974).

tutions of various states require the full impact of government condemnation activities be recognized.

■ Implicit in this trend away from the *damnum absque injuria* principle is the recognition of property rights as rights personal to the property owner. The just compensation requirement comes to mean that owners have a right to recover for real and actual losses resulting from governmental action even though that action falls short of a taking in the technical legal sense. Sackman–1976, *supra*, at 294. This recognition has allowed further development of the trend to the point of holding that an unconstitutional taking can occur even without physical entry or direct legal restraint.

> The developing expansion of the theory of constructive "taking"–sometimes referred to as inverse condemnation and more recently in the case law as *de facto* "taking"–has been responsive to the reality that activities carried on incident to massive, complex and time consuming programs launched by government to solve some of the acute problems that beset our society *may* so substantially interfere with one's use and enjoyment of his property as to constitute a compensable injury in a constitutional sense . . even though the power of eminent domain has not been formally exercised against property in question and there has been no physical intrusion of it.

*Redevelopment Auth. of City of Hazelton v. Hudock,* 2 Pa.Cmwlth. 670, 674, 281 A.2d 914, 917 (1971) (emphasis in text).

In the context of abandoned condemnation proceedings *Washington Market Ent., Inc. v. City of Trenton,* 68 N.J. 107, 343 A.2d 408 (1975) is probably the leading state decision. In that case the plaintiff owned commercial property in central Trenton. In 1958 the city initiated a redevelopment project which included eventual condemnation and demolition of plaintiff's property. A declaration of blight was made in 1967. By 1973 the city had acquired and demol-

ished about half the properties in the project area. Other properties in the area, including plaintiff's, experienced marked deterioration, substantial vacancies, and nearly complete loss of rental income. In 1973 the city notified the remaining property owners, including plaintiff, that the project was to be abandoned and their properties would not be acquired. While recognizing that the city had made no physical entry onto plaintiff's property and had put no direct legal restraint on it, the New Jersey Supreme Court found that the declaration of blight, redevelopment activities, and the passage of time had shorn the property of virtually all its value, and held that there had been a taking of property within the meaning of the state constitution.[7]

It should be noted that not all courts have endorsed the trend toward finding unconstitutional takings without physical intrusion or direct restraint. On facts closely analogous to those of *Washington Market, supra,* a New York court held no constitutional cause of action was stated. *Fisher v. City of Syracuse,* 78 Misc.2d 124, 355 N.Y. S.2d 239 (Sup.Ct., Onondaga Co., 1974), aff'd 46 A.D.2d 216, 361 N.Y.S.2d 773 (4th Dep't 1974), cert. denied 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975). *See also City of Buffalo v. J. W. Clement Co.,* 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895 (1971); *Orfield v. Housing and Redevelopment Authority,* 305 Minn. 336, 232 N.W.2d 923 (1975). Nevertheless, most state courts considering claims of unconstitutional taking in the context of abandoned acquisition plans have not required physical entry or direct restraint by a government entity before requiring compensation to the landowner. *See, e. g., Textron, Inc. v. Wood,* 167 Conn. 334, 355 A.2d 307 (1974); *Conroy–Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A.2d 598 (1974); *City of Detroit v. Cassese,* 376 Mich. 311, 136 N.W.2d 896 (1965); *see also,* Sackman–1978 and Sackman–1976, *supra.*

---

7. N.J.Const. Art. 1, ' 20 states, "Private property shall not be taken for public use without just compensation."

Federal courts considering taking claims in the context of discontinued acquisition plans have generally followed the trend toward finding an unconstitutional taking without direct legal restraint or physical intrusion. Federal courts have, however, closely scrutinized the propriety of the condemning authority's actions as well as their impact on the subject property. In *Foster v. City of Detroit*, 254 F.Supp. 655 (E.D. Mich.1966), aff'd 405 F.2d 138 (6th Cir. 1968), the plaintiff owned three properties that were included in a condemnation action filed by the city in 1950. In 1960 the city formally discontinued the action. In the interim the plaintiff's properties suffered extreme deterioration and loss of value.[8] In holding that the plaintiff's properties were taken without just compensation in violation of the requirements of the Fifth and Fourteenth Amendments, the Court noted that the city had actively encouraged and aggravated deterioration after the commencement of the condemnation action. 254 F.Supp. at 662. Among the actions noted were informing plaintiffs that they would receive no compensation for improvements, requiring the razing of vandalized buildings, and keeping a lis pendens in effect for five years after a stop order on the project had been issued. *Id.*

In what is perhaps the most pertinent federal case for our purposes, *Richmond Elks Hall Assn. v. Richmond Redevelopment Agency, supra*, the Ninth Circuit stated that

[w]hen a public entity acting in furtherance of a public project directly and substantially interferes with property rights and thereby significantly impairs the value of the property, the result is a taking in the constitutional sense and compensation must be paid.

561 F.2d at 1330. The case involved a commercial property that had been designated for acquisition by defendant agency in 1966 as part of an urban renewal program. After that designation the property and the area around it deteriorated. Tenants vacated; the property became unsaleable and its use for its intended purposes became severely limited. The Court noted acts by the agency in addition to designation for acquisition which contributed to the decline in value: it passed a resolution stating that owners and tenants had no right to compensation for remodeling that enhanced the value of the property; it entered into an option agreement with a developer to construct a shopping center on the land; it undertook street improvements that caused the basement of the subject property to be flooded and permanently altered; and it delayed the time when plaintiff's property was to be acquired. In 1972 the agency informed plaintiff that the property would not be taken. No formal condemnation action had ever been initiated.

In upholding the District Court's determination that an unconstitutional taking had occurred the Ninth Circuit found that the plaintiff's rights to use, sell, lease and encumber its property were directly and substantially impaired by the agency's action and this impairment had caused the significant reduction of value. This finding is in line with other federal cases that have held that there must be a substantial burden on the property rights of the owner before a compensable taking can be found and the burden must be a product of governmental actions that amount to abuse of the condemnation authority. *See Sayre v. City of Cleveland*, 493 F.2d 64 (6th Cir. 1974); *Thomas W. Garland, Inc. v. City of St. Louis*, 450 F.Supp. 239 (E.D.Mo.1978); *Madison Realty Co. v. City of Detroit*, 315

8. It should be noted that the city of Detroit reinstituted condemnation proceedings against plaintiff's properties about 18 months after it had abandoned its first condemnation action; this condemnation was fully carried out in 1963. The complaint in the case decided was filed before the second condemnation action was initiated. The fact that a second condemnation suit was pending did not affect the district and appeals courts' determination that there was an unconstitutional taking. It affected only the determination of the type of remedy that would issue, which was to set the valuation date of the property for purposes of the second condemnation at a date earlier than it would have otherwise been set. 254 F.Supp. at 666; 405 F.2d at 141-142.

F.Supp. 367 (E.D.Mich.1970); *Foster v. City of Detroit, supra.* Decrease in market value alone is not sufficient, for a property owner does not have a property right in the value of his property. *United States v. Willow River Co.,,* 324 U.S. 499, 502, 65 S.Ct. 761, 763, 89 L.Ed. 1101 (1944); *Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939); *see Agins v. City of Tiburon,* —— U.S. ——, —— n. 9, 100 S.Ct. 2138 n. 9, 65 L.Ed.2d 106, 113 n. 9; Note, "The Impact of Urban Renewal on Land Values: No Compensation for Nonacquired Land," 10 *Urban Law Annual* 385, 389 n. 28 (1975).

The decisions of Oregon courts are in accord with those of the federal courts. The leading Oregon case for our purposes is *Lincoln Loan Co. v. State Highway Commission, supra.* In that case plaintiff's property was designated for condemnation for a roadway. After the designation the plaintiff was warned by defendant that no compensation would be given for future improvements on the property. Plaintiff's tenants were told to vacate by defendant. Defendant acquired and dismantled surrounding properties, generating decay and desertion of the area. Ten years after defendant had made its initial designation formal condemnation proceedings had yet to be commenced. Plaintiff filed a complaint alleging that his property had been unconstitutionally taken, that the value of the property was reduced by $5,000 and that the rental income from the property had been reduced.

In holding that plaintiff's complaint stated a claim for inverse condemnation the Supreme Court said,

> [t]he combination of the acts alleged in plaintiff's complaint, the alleged pervasive extent of that combination of acts and the alleged duration of those acts over a ten–year period unite to allege a substantial interference with the use and enjoyment of its property by plaintiff.

274 Or. at 57, 545 P.2d at 109. This statement shows that the Oregon court considered not only the nature of the activities of the condemning authority, but also their duration, when passing on the viability of the constitutional challenge.

In *Lincoln Loan, supra,* the Court cited a long line of Oregon decisions supporting the principle that sufficient evidence of destruction, restriction or interruption of the necessary use and enjoyment of property can warrant recovery under the theory of inverse condemnation: *Morrison v. Clackamas County,* 141 Or. 564, 18 P.2d 814 (1933); *Tomasek v. Oregon Highway Comm'n, supra; Cereghino v. State Highway Comm'n,* 230 Or. 439, 370 P.2d 694 (1962); *Thornburg v. Port of Portland, supra.*

■ Our review of the authorities discussed above leads us to conclude that in order for a landowner to prove a taking in violation of the United States and Oregon Constitutions in the context of an abandoned condemnation plan he must show that the actions of the condemnor not only substantially burdened his property rights and significantly affected the value of his property but also amounted to an abuse of eminent domain authority. We find support for this conclusion in the Supreme Court's most recent land use regulation decision, *Agins v. City of Tiburon, supra.* In its opinion the Court noted with apparent approval the California Supreme Court's determination that institution and abandonment of eminent domain proceedings did not constitute an unconstitutional taking because the condemning authority acted reasonably and in good faith. —— U.S. —— n. 5, —— n. 9, 100 S.Ct. 2140 n. 5, 2142 n. 9, 65 L.Ed.2d 111 n. 5, 113 n. 9. Our next task is to determine whether the facts of this case amount to such a showing.

Thompson's specific claim is that the District's action of initiating eminent domain proceedings against the subject property caused him to forego an opportunity to purchase land for a road that would have allowed him to extensively subdivide the subject property. Thompson further claims that he could have sold the subject property for a greater profit than he actually received if the extensive subdivision had taken place.

We note that the facts of this case are in no way as extreme as those of the cases discussed above. Here there was no physical invasion and an eminent domain proceeding was actually filed. The legal action on the part of the District undoubtedly burdened Thompson's property rights because for all practical purposes he could not develop, subdivide, or sell the property while the proceeding was pending. This certainly was a direct burden on his use and enjoyment of the property.

 We have some difficulty in concluding that the District's initiation of condemnation proceedings caused Thompson to abandon his option to purchase the access property and thereby burdened his property right to use and enjoy the subject property. The access property was not being condemned by the District and Thompson could have purchased and developed it regardless of what happened to the subject property. Also, Oregon law clearly allows the District to abandon condemnation proceedings after they are initiated. Ore.Rev.Stat. 35.335. Thompson therefore knew or should have known that the subject property might become available for development in the future. The just compensation clauses of the United States and Oregon Constitutions are certainly not intended to relieve real estate developers of the burdens of business decisions that do not turn out to be correct.

As a practical matter, however, Thompson's cession of the access property can be seen as a burden on his property rights in the subject property that was caused by the District's actions. Without the access property Thompson could not use the subject property as he intended, that is he could not subdivide as extensively as he wanted, and thus his right to use the subject property was burdened. This burden can be seen as a result, albeit not truly direct, of the District's actions because its apparent sincerity in pursuing the condemnation at the time Thompson had to decide whether to buy the access property would certainly cause any developer to forego development plans for the subject property.

It is also fair to conclude, given the valuation figures noted in our findings of fact, that the District's actions had a substantial effect on the value of the subject property.

To conclude that the District's actions burdened Thompson's property rights and substantially affected the value of the subject property does not, as discussed above, necessarily lead to a conclusion that there was an unconstitutional taking. The District's actions must be scrutinized to see if they amount to an abuse of eminent domain authority.

 The apparent good faith of the District in first determining to condemn the subject property and then deciding to abandon the project is a factor that should be considered in passing on the abuse issue. *Foster v. City of Detroit*, 254 F.Supp. at 662. It is not, however, dispositive. It may be, as was apparently the case in *Richmond Elks* and *Lincoln Loan, supra*, that a condemning entity is sincere in its intent to diligently pursue a particular project but its efforts are stymied for reasons, such as an unanticipated cut–off of federal funds, beyond its control. Nevertheless, consideration of other factors can lead to a conclusion that there has been an abuse of condemnation power.

Another factor to consider is what other actions the condemning entity took besides the attempted condemnation of the property that is the subject of the lawsuit. In *Foster v. City of Detroit, supra*, it was apparent that the city acted affirmatively to lower the value of the subject property. In *Richmond Elks* and *Lincoln Loan, supra*, the condemning entities took a number of actions which physically burdened the subject properties and decreased the income they produced. The evidence in this case discloses no such actions. Here the District's only action was to file suit against the subject property. Because the District had no knowledge of Thompson's option to purchase the access property, it was unaware of the impact of its action.

The factor which is perhaps the most important for determining if eminent do-

main authority has been abused is the amount of time between the initiation and abandonment of the condemnation process. The extensive delays in *Foster* (ten years), *Richmond Elks* (six years), and *Lincoln Loan* (ten years) were specifically noted in the decisions. These long time periods severely burdened the use and enjoyment of the subject properties and were probably the most significant cause of the decline in property values experienced by the plaintiffs. In this case it was approximately a year between the District's initiation and abandonment of the condemnation proceeding. A year is a relatively short period of delay in comparison to those experienced by the plaintiffs in *Foster, Richmond Elks*, and *Lincoln Loan.*

Considering the factors of good faith, other actions, and delay we cannot conclude that the District abused its eminent domain authority in initiating and abandoning condemnation proceedings against Thompson's property. The District's actions no doubt burdened Thompson's property rights and caused him to forego his subdivision plans. But the actions were not egregious and do not permit a conclusion that Thompson's property was taken without just compensation. *See Heinrich v. City of Detroit*, 90 Mich.App. 692, 282 N.W.2d 448 (1979).

In reaching this determination we are guided by an understanding that the condemnation process is perhaps the only means a governmental entity has for surely determining the value of real estate it would like to commit to public use. *Danforth v. United States*, 308 U.S. at 284, 60 S.Ct. at 236. If the value determined makes pursuit of the project too costly, then the entity must have a means of backing out. Without such opportunity to abandon condemnation efforts governments would hesitate to pursue any taking and the public facilities required for public needs would not be attained.

The situation is analogous to implementing land use regulations that limit the type and the scope of development that can take place on a particular land area. In that context the Supreme Court has stated:

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power.

*Pennsylvania Coal Company v. Mahon*, 260 U.S. 393, 403, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). This position was reiterated in *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926):

> [Land use] laws and regulations . . . must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions.

*See Agins v. City of Tiburon, supra; see generally*, Freeman, "Give and Take: Distributing Local Environmental Control through Land–Use Regulation," 60 *Minn.L. Rev.* 883, 927–951 (1976).

In this case the District had statutory authority to initiate and abandon condemnation proceedings. Ore.Rev.Stat. 35.215 *et seq.*, 266, 410(3). The fact that it exercised its authority within guidelines set down by

the legislature does not, however, mean that the exercise did not cause an unconstitutional taking because the impact of the actions may not comport with due process. *Foster v. City of Detroit,* 254 F.Supp. at 661; *see Chicago, B. & Q. R. R. v. City of Chicago, supra.* The facts and circumstances surrounding the District's exercise of condemnation power show that it burdened Thompson's property rights and adversely affected the value of the subject property. The facts and circumstances also show that the District's actions did not deprive the subject property of all or virtually all of its value and did not amount to an abuse of its eminent domain authority. We cannot delineate what proportion of a property's value must be lost before a taking can be found, nor can we determine in advance what actions on the part of a condemning authority will constitute an abuse of eminent domain power. We are only able to say that the facts and circumstances of this case do not allow a conclusion that an unconstitutional taking has taken place.

### III

 For the sake of completeness in this decision we will discuss the valuation procedure that would apply in this case if we had found an unconstitutional taking. Authorities differ as to the appropriate method of establishing just compensation when a landowner is claiming a partial rather than a complete taking. 4A *Nichols on Eminent Domain* § 14.23 (1979); *see,* "Developments in the Law: Zoning," 91 *Harv.L.Rev.* 1427, 1497–1501 (1978). Since in this case the District actually took no part of Thompson's property, and therefore there is no need to value what was taken, the most appropriate formula to apply is the "before and after rule" wherein the damages are computed as the difference between the market value before and after the taking. 4A *Nichols on Eminent Domain* § 14.23 at p. 14–83 (1979). This was the formula applied in *Foster v. City of Detroit,* 254 F.Supp. at 666.

 Application of this formula requires a three–step approach: First, the date of taking must be determined.

Second, the value of the property just before and just after the taking must be ascertained. Finally, the difference between the two values must be calculated. *See City of Detroit v. Cassese,* 376 Mich. at 318–319, 136 N.W.2d at 900–901.

The first step is perhaps the most difficult in this case. Under Oregon condemnation statutes, Ore.Rev.Stat. 35.205 *et seq.,* the date of valuation, in the absence of pre–judgment possession, apparently is the date of filing of the condemnation complaint. *State v. Hawk,* 105 Or. 319, 208 P. 709 (1922). The same is apparently true under the federal Sundry Civil Appropriation Act, 40 U.S.C. § 258a. These statutory rules do not apply in this case, however, because if a taking had taken place it would have been a taking governed by the United States and Oregon Constitutions, not the cited statutes. And the applicable constitutional provisions do not, of course, provide any guidance as to valuation date. The District Court in *Foster v. City of Detroit, supra,* provided what is perhaps the most appropriate test for determining a valuation date for an unconstitutional taking. In setting the valuation date in that case the Court looked to the time when the actions of the city had a substantial effect upon the subject property. 254 F.Supp. at 666. *See Washington Market Enterprises v. City of Trenton, supra; Klopping v. City of Whittier, supra.* Applying this test to the facts of this case we conclude that the valuation date is June 8, 1977, the date that the District abandoned the condemnation proceeding. This is the date when the action of the District of initiating the condemnation proceeding had the most substantial effect on the subject property for after this date Thompson could go ahead with development plans but could not develop the subject property as he wanted to because the access property was unavailable. It was on this date that Thompson's cession of the access property had the most acute impact.

The second step of the valuation analysis calls for ascertaining market value before

and after the property was taken. As noted in our findings of fact, *supra,* the value of the subject property would have been $112,717 in June, 1977 if the access property had been acquired. Without the access property, the subject property was worth $80,750 in June, 1977. The third step is calculation of the difference between these two figures. In this case the difference is $31,967, and that is the amount of diminution in value suffered by the subject property as a result of the District's condemnation activities.

## IV

In reaching our conclusion as to diminution in value we have not disregarded the District's contention, based on *Clarke v. Port of Portland,* 23 Or.App. 730, 543 P.2d 1099 (1975), that frustration of an owner's future plans should not be considered in the valuation process. This is the usual rule. 4A *Nichols on Eminent Domain* § 14.241[4] (1979). In the case of raw, undeveloped land, however, the valuation process may include consideration of future plans when the land is suited for the use proposed and there has been preparation and pursuit of those plans. 4 *Nichols on Eminent Domain* § 12,3142[1][a] (1979). This was the situation here. The subject property was suited and zoned for single family residences, Thompson had prepared subdivision plans and was gaining necessary approvals, and, as witnesses for both sides acknowledged, it was likely that some sort of extensive subdivision of the subject property would occur if southerly access was available.

## V

In conclusion, we hold that no unconstitutional taking has occurred in this case because the District did not abuse its eminent domain authority. The Clerk will be directed to enter judgment in favor of the District with its costs to be paid by Thompson.

## APPENDIX