CITY OF CINCINNATI, Appellee,

v.

CHAVEZ PROPERTIES, Appellant, et al.

[Cite as *Cincinnati v. Chavez Properties* (1996), 117 Ohio App.3d 269.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–960073.

Decided Dec. 18, 1996.

*Fay D. Dupuis*, City Solicitor, and *Mark C. Vollman*, for appellee.

*William E. Santen* and *Edward E. Santen*, for appellant.

*Per Curiam.*

Appellant Chavez Properties ("Chavez") appeals from the judgment of the trial court in which the court determined, following a bench trial, that there was insufficient evidence to demonstrate that the actions of appellee city of Cincinnati constituted a taking of Chavez's property. Chavez raises three assignments of error in its appeal, contending that the trial court erred by (1) failing to consider whether the city's actions advanced legitimate state interests, (2) precluding discovery and evidence concerning communications between the city's attorney and the Cincinnati Public School Board's attorney relating to the value of the subject property, and (3) assessing court costs against Chavez in contravention of R.C. 163.21. Concluding that these assignments of error have no merit, we affirm the trial court's judgment.

Having reviewed the voluminous record, we adopt the trial court's background findings of fact and set them forth *verbatim* as follows:

"The evidence established the following background. In 1986, Chavez, a defendant in this action and current owner of the property at issue, purchased a 99–year ground lease from Sylvia Mansbach pertaining to certain real property. The property, a surface parking lot, located at the northwest corner of Race Street and Garfield Place in downtown Cincinnati, is referred to herein as the 'Chavez Property.' Chavez became the owner of the property in 1994, paying the agreed upon purchase price of $400,000.

"Plaintiff City of Cincinnati had long incorporated this property in its urban renewal plans for the Central Business District Core project located between Race and Elm Streets and Eighth and Ninth Streets. On July 8, 1982, Cincinnati Council approved and adopted the modified Urban Renewal Plan for the Central Business District Core Project, entitled 'Cincinnati 2000 Plan; A Comprehensive Development Plan for Downtown,' dated June, 1982. The Cincinnati 2000 Plan contains proposals for future implementation by private and public forces, pursuant to a common design theme. The Chavez property is located within the geographic boundaries of the Cincinnati 2000 Plan.

"On January 28, 1987, Cincinnati City Council approved and adopted revisions to the Urban Renewal Plan for the Central Business District Core Project, in part by amending the Cincinnati 2000 Plan at page 23 (Revised Potential Growth by Sub–Area Table). On August 19, 1987, Real Estate Research Corporation submitted a report of its recommendations for the Garfield Place rental apartment development to the City. This report applied specifically to the proposed first phase of the development which is located on the site bounded by Elm Street, Seventh Street, Garfield Place and Garfield Tower Apartments.

"The City commissioned Gruzen, Samton & Steinglass to prepare a master plan for the Garfield Place housing concept. The master plan identified six sites for development of housing. The subject property is located in the development site numbered 5 in the master plan, to be used for the development of middle income residential units. On March 21, 1990, pursuant to the Gruzen plan, City counsel [*sic* ] passed Ordinance 88–1990. The ordinance authorized the City Manager to execute the Contract for Sale of Land for Private Redevelopment. Section 4(f) of the Contract for Sale of Land for Private Redevelopment provided that the City would use its best efforts to acquire, within 18 months after the commencement of construction of a parking garage, all right, title and interest in the property located north of Garfield Place between Race Street and Elm Street, which area included the Chavez property.

"The plans were reviewed and approved by appropriate entities. The City proceeded with plans for the Garfield Project. Piatt Park, located on Elm Street

bordering the Chavez property, was renovated at a cost of two to three million dollars. The City entered into negotiations with the property owners. Ultimately the City purchased two of the three properties; a corner surface parking lot, and an interior lot on which the Milner Hotel was situated. The Milner primarily served low income and homeless people.

"Pursuant to negotiations with Chavez, the City eventually offered Chavez $700,000 for the property. Chavez refused this offer. Unable to reach an agreement with respect to price, on July 10, 1992, the City filed suit under the instant case number to appropriate the Chavez property. A jury trial was scheduled for December 6, 1993.

"John Shirey became Cincinnati City Manager in 1993. As the trial approached, the City, primarily by and through City Manager Shirey, determined the project could proceed without the subject property. Within a week before trial, the City filed a Notice of Abandonment of the appropriation."

On April 28, 1994, approximately four months after the notice of abandonment, Chavez filed a motion for leave to file its counterclaim for inverse condemnation, which the trial court granted on June 15, 1994. Therein Chavez argued that it was entitled to both a declaration that the city was precluded from abandoning the appropriation proceedings because the city had accomplished a taking of its property and a writ of mandamus compelling the city manager to continue the appropriation action. In short, Chavez argued that by including its property in the plans for redevelopment, acquiring surrounding properties, and refusing to meet its selling price, the city precluded Chavez's property from being sold, developed, improved, and/or assembled, thus "taking" the property without just compensation in violation of the United States and Ohio Constitutions.

The evidence demonstrates that Chavez purchases downtown properties to position itself in the path of urban renewal. The city initially planned to appropriate Chavez's property and offered Chavez $700,000 for the property based on the approximately $600,000 value ascertained by the city's appraisers. Chavez, based on its appraisers' 1993 estimations of value of $1.2 to $1.4 million, refused the offer. The city manager determined that the development could occur without the property and, thus, concluded that the asking price was not economically justifiable.

The parties tried the counterclaim to the trial court in an eleven-day bench trial. The trial court, in a well-reasoned, thirty-six-page decision, concluded that Chavez was not entitled to a writ of mandamus and declared that the city's actions did not constitute an appropriation of Chavez's property.

In its first assignment of error, Chavez argues that the trial court's analysis was erroneous because it failed to consider whether the city's actions in abandon-

ing the appropriation of Chavez's property advanced any legitimate state interest. We find no merit in this assignment of error.

Inverse condemnation, the cause of action proceeded upon by Chavez, is a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *United States v. Clarke* (1980), 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373, 377; *Agins v. City of Tiburon* (1980), 447 U.S. 255, 258, 100 S.Ct. 2138, 2140, 65 L.Ed.2d 106, 110, fn. 2. The action has also been recognized when condemnation proceedings, once instituted, have been abandoned. *Thompson v. Tualatin Hills Park & Recreation Dist.* (D.Or.1980), 496 F.Supp. 530, 539, affirmed (C.A.9, 1983), 701 F.2d 99, citing Sackman, Factors in Inverse Condemnation, Institute on Planning, Zoning, and Eminent Domain (1978); Sackman, Condemnation Blight–Part II, Institute on Planning, Zoning and Eminent Domain (1976); 4 Nichols, Eminent Domain (3 Ed.Rev.1979), Section 12.3151(5), fn. 54 and 55 and accompanying text; Shonkwiler & Morgan, Land Use Litigation (1986) 19, Section 1.02(6)(a). "Inverse condemnation actions can be grouped into two broad categories, those alleging that particular government-imposed land use regulations are unduly restrictive and those claiming that certain government activities, such as operating an airport or pursuing an urban renewal project, substantially interfere with use and enjoyment of property." *Thompson, supra,* 496 F.Supp. at 539.[1] Recent years have seen a "significant expansion in the nature of claims which have been asserted under the 'inverse condemnation' rubric, as a result of a series of United States Supreme Court decisions dealing principally with the field of 'regulatory takings.'" 2A Nichols, Eminent Domain (3 Ed.Rev.1996) 6–229, Section 6.14[1], citing *Lucas v. South Carolina Coastal Council* (1992), 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798; *Nollan v. California Coastal Comm.* (1987), 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677; *United States v. Clarke, supra; Agins, supra; Penn Cent. Transp. Co. v. New York City* (1978), 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631. "The term 'regulatory taking' refers to situations in which the government exercises its 'police powers' to restrict the use of land or other forms of property. This is often accomplished through implementation of land use planning, zoning, and building codes. In contrast, a governmental entity exercises its eminent domain power * * * where it takes unto itself private resources and uses them for the common good." Shonkwiler & Morgan, Land Use Litigation (1986) 6, Section 1.02(1). As this court has previously stated:

---

**1.** Other terms for inverse condemnation are "constructive taking" or *"de facto* taking." *Thompson, supra,* 496 F.Supp. at 539.

"The determination of whether a *governmental regulation* amounts to a constitutional taking under the doctrine of inverse condemnation is not made according to any precise rule and generally requires a weighing of private and public interests. *Agins v. City of Tiburon* (1980), 447 U.S. 255, 260–261, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 111–112. Courts will typically find that the application of a general zoning law [or regulation] to a particular property effects a taking if the ordinance [or regulation] does not substantially advance legitimate state interests or denies an owner economically viable use of his land. *Id.* at 260, 100 S.Ct. at 2141, 65 L.Ed.2d at 111–112. See, also, *Karches v. Cincinnati* (1988), 38 Ohio St.3d 12, 526 N.E.2d 1350." (Emphasis added.) *The Shopco Group v. Springdale* (1990), 66 Ohio App.3d 702, 705, 586 N.E.2d 145, 147–148.

Because the validity of a regulation depends upon whether it is within the acceptable breadth of the exercise of police powers, a regulation requires close scrutiny to determine whether its application to a particular property substantially advances a legitimate state interest.

Chavez is not arguing excessive regulation without just compensation. It is arguing that the city's actions in advancing its intention to appropriate Chavez's property in the future and failing to do so, coupled with its purchase of surrounding property, constitute a taking. Chavez's argument rests on the proposition that the appropriation of its property was without any legal authority in that the taking occurred neither by regulation nor by actual eminent domain. Thus, the analysis required of the application of a regulation to Chavez's property is not at issue. We agree with the trial court that where the type of government action allegedly constituting "inverse condemnation" involves neither physical invasion nor direct legal restraint under the police powers, the balancing analysis required of a regulatory taking is inapplicable, and a court need only consider whether there was a "substantial interference with the owner's property rights." *State ex rel. Pitz v. Columbus* (1988), 56 Ohio App.3d 37, 41, 564 N.E.2d 1081, 1086; see *McKee v. Akron* (1964), 176 Ohio St. 282, 27 O.O.2d 197, 199 N.E.2d 592; *J.P. Sand & Gravel Co. v. Ohio* (1976), 51 Ohio App.2d 83, 5 O.O.3d 239, 367 N.E.2d 54. Accord *Richmond Elks Hall Assn. v. Richmond Redevelopment Agency* (C.A.9, 1977), 561 F.2d 1327; *Woodland Market Realty Co. v. Cleveland* (C.A.6, 1970), 426 F.2d 955; *Thompson,* 496 F.Supp. 530; *Heinrich v. Detroit* (Mich.App.1979), 90 Mich.App. 692, 282 N.W.2d 448; *Textron, Inc. v. Wood* (Conn.1974), 167 Conn. 334, 355 A.2d 307; *Hazleton Redevelopment Auth. v. Hudock* (1971), 2 Pa.Commw. 670, 281 A.2d 914.

Further, to the extent that Chavez is arguing that the mere expression of the intent to take private property in the future, the enactment of legislation authorizing condemnation of property, or the filing of condemnation proceedings

in and of itself constitutes a taking, that argument is without merit. *J.P. Sand & Gravel Co., supra; 23 Tracts of Land v. United States* (C.A.6, 1949), 177 F.2d 967. This is because the condemnor has the right to determine whether the valuations of a piece of land leave the cost of completion of a project within its resources, and to abandon its efforts to acquire the property if necessary. See *id.; United States v. 2,175.86 Acres of Land* (C.A.5, 1983), 696 F.2d 351, affirmed *sub nom. Kirby Forest Indus. v. United States* (1984), 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1.

Even were we to utilize the analysis forwarded by Chavez, the evidence presented at trial demonstrates the advancement of legitimate state interests. The city manager testified that he made the decision to drop the condemnation proceedings against Chavez's property based upon his determinations that the development project at issue could be completed without the property and that it would not be economically feasible to meet Chavez's asking price because the city would not be able to recover the additional cost from the project. Moreover, the city manager's other recourses in meeting the price included taking the money from other projects, resulting in fewer projects being completed, or using additional taxpayer money. Chavez's first assignment of error is overruled.

In its second assignment of error, Chavez argues that the trial court erred by precluding discovery and admission of evidence concerning communications between the city's attorney and the Cincinnati School Board's attorney concerning the value of Chavez's property. The trial court's decision had two premises: (1) attorney-client privilege and (2) irrelevancy of the tax-value increase to the theory of Chavez's case. Because we agree with the trial court that the tax increase is irrelevant to whether Chavez's property has been "taken" by the city, we need not address the other basis of its decision. Chavez's counsel argued at trial that the complaint filed with the Hamilton County Board of Revision by the Cincinnati School District Board of Education seeking a tax increase on Chavez's property as a result of Chavez's testimony of its value was relevant to whether the city had appropriated its property. The trial court concluded that raising taxes was irrelevant to any claim of a taking, but said the issue could be revisited if the city argued the value of the property should be lowered based on Chavez arguing a lower value to the Board of Revision.

Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence which is not relevant is inadmissible. Evid.R. 402. "A trial court has broad discretion in determining whether to admit or exclude evidence. Absent an abuse of discretion that materially prejudices a party, the trial court's decision

will stand." *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 66, 567 N.E.2d 1291, 1298–1299. We cannot conclude that the trial court abused its discretion in determining that the decision by a school board to seek a tax increase on the subject property was irrelevant in this case. The issue for the trial court to decide was whether the city had interfered substantially with Chavez's property rights. Whether there was a "conspiracy" between the city and the school board to raise Chavez's property tax was not at issue, nor did such allegation have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Thus, the trial court did not abuse its discretion by excluding the evidence as irrelevant. Moreover, even had we concluded that the trial court abused its discretion, we do not perceive how the exclusion of the evidence materially prejudiced Chavez. Chavez's second assignment of error is overruled.

In its third assignment of error, Chavez seeks the costs it expended from August 1992 until July 20, 1994, pursuant to R.C. 163.21, which requires the payment of costs expended by a condemnee during appropriation proceedings upon abandonment of such proceedings by a condemnor. The city filed its appropriation action July 10, 1992. It filed a notice of abandonment of appropriation proceedings on December 6, 1993. The city paid Chavez $70,000 pursuant to a release and settlement agreement entered into November 30, 1995, in regard to the abandonment of the appropriation proceeding. Chavez requested permission to file its counterclaim alleging inverse condemnation on April 28, 1994, which was granted. We find no support for Chavez's argument, nor do we interpret R.C. 163.21 to allow for costs and fees incurred by a condemnee subsequent to the abandonment of appropriation proceedings by the condemnor. Such a conclusion would make the condemnor's financial responsibility far greater than that contemplated by the legislature. Thus, we overrule Chavez's third assignment of error.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

HILDEBRANDT, P.J., PAINTER and SUNDERMANN, JJ., concur.