OPINION
Respondent-appellant, the Ohio Department of Natural Resources appeals from the decision of the Belmont County Court of Common Pleas issuing a writ of mandamus ordering it to commence appropriation proceedings for the acquisition of Riviera Bowling Lanes owned by relators-appellees, Hardale Investment Co., Dale Michaels, and Harry Mowder.
In the early 1960's, the Riviera Bowling Lanes (Riviera) was constructed in front of the entrance to an abandoned coal mine in Bellaire, Ohio. According to the evidence adduced at trial, Dale Michaels and Harry Mowder, joint owners of Hardale Investment Co. (Hardale) purchased Riviera in June of 1978. From the time of the purchase, appellees received occasional complaints about odors emanating from different places in the building. However, in February of 1985 appellees received numerous complaints from patrons and employees that fumes were causing headaches and dizziness.
As a result of these complaints, appellees called the Columbia Gas Company. An employee from the gas company discovered that methane gas was being emitted from the opening to the mine. At this point the testimony is in conflict. According to Michaels, the gas company employee telephoned Michael Wallace, the fire chief for the City of Bellaire Fire Department, who arrived at the building approximately an hour later. Michaels testified that upon arrival Chief Wallace informed him that he had contacted the Ohio Department of Natural Resources (ODNR) and that it would be sending people to take air readings inside the building. The following morning ODNR employees arrived and went through the building testing the air.
According to Michaels, sometime in late February 1985 he was informed by Hal Miller of ODNR that the results of the testing had revealed a methane gas problem. Miller also apparently told Michaels that ODNR would be able to remedy the problem, but that they would have to declare the problem an emergency. In addition, Miller stated that ODNR would seek assistance for the project from the Office of Surface Mines (OSM), a division of the United States Department of the Interior. Michaels also claimed that he was asked by ODNR to voluntarily close the building down in the meantime, to which he responded that he would not.
Michaels further testified that on March 6, 1985 he received a phone call from Chief Wallace who stated that he was coming to the building to show Michaels a letter he had received from ODNR. Michaels called his attorney at the time, John Malik, who arrived at the building at about the same time as Chief Wallace. According to Michaels, Chief Wallace showed the letter to Michaels and Malik, and asked them to read the first paragraph in which ODNR had classified the methane gas problem as an emergency situation. Michaels stated that Chief Wallace then asked him to voluntarily close the building or face closure by order of the Fire Department. Upon the advice of Malik, Michaels refused to voluntarily close the building and the following day Chief Wallace returned to the building and posted a Fire Department citation ordering the building closed until the hazard was corrected.
Much of the foregoing testimony was disputed at trial. Testifying on behalf of ODNR, Chief Wallace testified that Michaels had requested that the Fire Department order the building closed in order to present a claim under his business interruption insurance coverage. According to Chief Wallace, Michaels explained to him that if he were to voluntarily close the building he would be unable to seek compensation under his insurance policy. Chief Wallace stated that after discussions with the city law director, he issued the citation based on sections of the Ohio Fire Code dealing with the elimination of dangerous or hazardous conditions.
Both parties agree that work was undertaken to fix the gas problem. According to Michaels, the actual work was done by contractors hired by OSM. However, Michaels claimed that during the time that the work was being carried out he was informed by representatives of ODNR that he was not allowed in the building, and that if he did enter he would be arrested.
Michaels claimed that the work was completed sometime in the summer of 1986, but that ODNR informed him that there was some disagreement between ODNR and OSM as to whether the problem had been successfully remedied. According to Michaels, after the work was completed he was again instructed by ODNR that he could not enter the building.
Terry Dalton, an employee of OSM testified in more detail concerning the work undertaken to remedy the methane gas problem. According to Dalton, OSM was notified of the problem by ODNR, Michaels, and the Bellaire Fire Department. Dalton testified that ODNR's only involvement with the project was the initial referral to OSM and the provision of background eligibility information needed in order to determine if the project was suitable for federal emergency status. Dalton also introduced a letter from Hardale to OSM, dated February 18, 1985, in which Hardale requested that OSM purchase Riviera rather than take corrective measures to remedy the problem.
Dalton also explained that the project was conducted pursuant to Section 410 of the Surface Mining Control and Reclamation Act of 1977 (SMCRA), a federal statute that grants authority to the Secretary of the Interior to expend federal funds in the abatement of problems associated with the adverse effects of coal mining practices.
According to Dalton, OSM asked Hardale to sign a hold harmless agreement indemnifying OSM prior to the commencement of work. Hardale, apparently upon the advice of counsel, refused to do so because of concerns over their business interruption insurance coverage. Dalton testified that Hardale requested OSM enter the property to effectuate repairs under the police powers contained under Section 410 of SMCRA. OSM agreed, apparently because the arrangement called for a friendly use of the police powers. According to Dalton, had Hardale been opposed to the use of the police powers, OSM would not have conducted the project at all. Dalton clarified that OSM had not closed Riviera, but had simply received a right of entry to conduct the repairs.
Robert Baker, the program manager with the Division of Mines and Reclamation of ODNR, testified that besides making initial referrals and providing eligibility information to OSM, ODNR had no involvement in the conduct of emergency projects, and had not ordered the closing of Riviera. Baker further testified that ODNR has never closed a building in order to conduct a reclamation project, that ODNR has no authority to close buildings, and that ODNR had had no involvement with the day to day activities of the project carried out at Riviera.
In May of 1985, Hardale filed a complaint against City Insurance Co., seeking coverage under a business interruption policy. In the complaint, Hardale alleged that Riviera had been closed on March 6, 1985, because of a dangerous methane gas problem and at the request of the insurance company in order to prevent an "increase of the hazard." In an opinion and decision dated December 31, 1985, Judge Charles Knapp stated that Riviera had been closed and posted by the chief of the Bellaire Fire Department, and granted summary judgment in favor of Hardale. In a subsequent entry, both parties stipulated that the case was settled and dismissed.
In May 1988, Hardale filed a federal tort claim against the United States for damages incurred through negligent repairs to Riviera. The claim specifically alleged that the contractors had been hired by OSM. The claim was denied on September 13, 1988 and was not appealed by Hardale.
Unsatisfied with the efforts of OSM to remedy the methane gas problem, Hardale continued to seek restitution from the federal government. In order to do this Hardale sought the aid of the Board on Unreclaimed Strip Mined Lands (Board), an entity established under R.C. 1513.29.[1] By statute, the Board is charged with the gathering of information and the making of recommendations concerning the reclamation of eroded land within Ohio. Baker testified that Hardale notified the Board that they were disappointed with the results of the project conducted by OSM, and that they sought support from the Board in obtaining compensation from the federal government. Michaels, along with Malik, appeared before the Board on November 10, 1986. During the meeting both Michaels and Malik stated that OSM had ordered Riviera closed. As a result of the meeting, the Board passed a resolution recommending that OSM acquire the property by means of a special appropriation from Congress. The resolution stated that Riviera had been closed by order of the chief of the Bellaire Fire Department. Ultimately, OSM refused to buy the property.
According to ODNR's answer, on January 15, 1987 the Board recommended that the federal government, purchase Riviera for $1,805,000, a price based on an appraisal order by the State of Ohio. This recommendation apparently went unheeded. Hardale came before the Board again in 1991, the result of which was another resolution. This resolution, drafted by lawyers for Hardale, recommended that OSM and the State of Ohio enter into a cooperative agreement to acquire the property, with the state paying 40 percent of the cost and the federal government paying the remaining 60 percent. Notably, the resolution stated that Riviera had been ordered closed since November 1985 by order of the State of Ohio. However, Baker, who was present at the meeting, testified that there was no discussion as to whether ODNR had ordered the property closed.
Although unclear from the trial testimony, this second resolution appears to have met with little success. According to Michaels, sometime either in 1995 or 1996 ODNR made an offer to purchase the property for $500,000. However, Michaels testified that when the contract arrived it was for $388,000, which offer Hardale did not accept. Alternatively, Hardale's amended complaint alleges that the offer of $500,000 was a recommendation made by the Board which ODNR refused to follow. Baker testified that the acquisition of property is discretionary on the part of ODNR, and that recommendations from the Board were not self-executing. Baker also stated that on only one prior occasion had ODNR disregarded a recommendation from the Board.
On January 10, 1996 appellees filed an inverse condemnation action in the Belmont County Court of Common Pleas. The complaint alleged that Riviera had been closed by an order issued by ODNR and that appellees had been denied use and access to the property from March 6, 1985 onwards. Further, the complaint sought $1,806,500 for the value of the property, $2,034,168 in interest, $125,000 in attorney fees, and $1,925,000 in lost profits.
On August 27, 1996 appellees filed an amended complaint to add a request for a writ of mandamus directing ODNR to commence an appropriation action to compensate appellees for the loss of their property. Presumably in response to appellant's argument that the Court of Claims has original and exclusive jurisdiction in civil actions for money damages against the state, on October 29, 1996 the trial court struck appellees' request for money damages permitting the case to continue on the mandamus action. Appellant then filed its answer, denying that it had ordered the closing of Riviera or that it had denied appellees' access to the property, and raising the statute of limitations as one of its defenses.
A bench trial commenced on June 26, 1998 before Judge Knapp. At the close of trial both parties were permitted to submit proposed findings of fact and conclusions of law, along with their closing arguments. On August 20, 1998 the trial court issued its decision granting appellees' prayer for writ of mandamus and ordering appellant to file an appropriation case. Specifically, the trial court found that the applicable statute of limitations was twenty-one years, rather than the two or four year statute of limitations appellant had argued for. The court also found that ODNR had represented to appellees that it would remedy the problem or purchase the property, and that through the representations of its agents ODNR had allowed appellees to believe their interests were being protected.
In addition, the trial court addressed the issue of whether Riviera had been closed in order to abate a nuisance pursuant to R.C. 1513.27. The trial court apparently dismissed this defense on the grounds that witnesses for appellees had all testified that ODNR had continued to exercise dominion over the property after the federal project had been completed, and that thirteen years "is a long time to abate a nuisance especially when nothing has been done for the last twelve (12) years."
The final issue taken up by the trial court in its judgment entry was whether the actions of ODNR constituted a taking of appellees' property. The trial court began by commenting on the affidavits sworn to by Chief Wallace. On August 7, 1996 Chief Wallace gave an affidavit in which he stated that the citation ordering the closure of Riviera had been done "upon the recommendation and virtual directives received from ODNR." However, on March 3, 1997 Chief Wallace gave another affidavit in which he stated that Michaels had asked him to close Riviera in order to support an insurance claim. Chief Wallace also stated that he informed Michaels that the order would expire in twenty-four hours unless the City of Bellaire sought an injunction extending the order, which the city had not done. Hence, according to Chief Wallace's second affidavit the order closing Riviera had expired on March 7, 1985. Chief Wallace also stated that ODNR had given no verbal or written orders to close the property, and that his statement concerning ODNR's virtual directives, made in his first affidavit, was in reference to lab reports provided by the Ohio Division of Mines.
The trial court noted that Chief Wallace's trial testimony had been consistent with the second affidavit, but was apparently concerned that the witness could make contrary affidavits so close in time to one another.
Other evidence relied on by the trial court in reaching its decision was that of Michaels and Malik who both testified that a representative of ODNR had warned them that if Michaels entered the property after the close order was issued he would be arrested, as well as the testimony of Robert Ney that it was the consensus of the Board that the state had ordered the property closed, and that although ODNR was in agreement over purchasing the property Baker had not wanted to deplete his budget and was trying to get federal funding. The trial court also noted that in the 1991 resolution of the Board where the State of Ohio had been credited with closing Riviera, Baker, who had been present, had not dissented or otherwise objected.
Furthermore, the trial court ruled that its prior holding in appellees' case against their insurer, that the property had been closed by the chief of the Bellaire Fire Department, had been correct, but that appellants reliance upon it in the instant case was misplaced, apparently because of the amount of evidence involved. Finally, the trial court found that the OSM project had finished on June 6, 1986, that appellees were physically displaced from the property, that prior to ODNR's offer to purchase ODNR had acknowledged control over the property, and that Baker had been more concerned with his budget than with appellees' constitutional rights. Accordingly, the court issued appellees' prayer for writ of mandamus.
On September 18, 1998 ODNR filed a timely notice of appeal, along with a motion for stay of execution of judgment pending the appeal. The trial court granted the stay of execution, and the appeal is now before this court. ODNR sets forth nine assignments of error on appeal. Since a successful statute of limitations argument would obviate our need to address other perceived errors, we begin with ODNR's ninth assignment which states:
 "THE TRIAL COURT ERRED WHEN IT HELD THAT ODNR IS ESTOPPED FROM RAISING THE DEFENSE OF STATUTE OF LIMITATIONS."
The trial court held that because ODNR allowed appellees to think that their interests were being protected, equitable estoppel bars ODNR from asserting a statute of limitations defense. ODNR states that the doctrine of estoppel does not apply against a state or its agencies in the exercise of a government function. See State ex rel. Chevalier v. Brown
(1985), 17 Ohio St.3d 61, 63; Besl Corp. v. Public Util. Comm.
(1976), 45 Ohio St.2d 146, 150; Prisby v. City of Youngstown
(Aug. 14, 1996), Mahoning App. No. 94 C.A. 234, unreported. ODNR then argues that taking property is a government function so the doctrine of equitable estoppel does not preclude it from raising a statute of limitations defense. Nonetheless, due to the following resolution of the issue of the applicable statute of limitations, whether or not estoppel applies to ODNR is irrelevant.
The statute of limitations starts running at the time of the alleged taking by ODNR. The trial court found that OSM finished their project on June 6, 1986. As a result, the court determined that the date of the taking by ODNR was June 6, 1986 because ODNR refused to allow appellees access to their property after the OSM project.
In order to determine if appellees' action is barred by the statute of limitations, we must determine the applicable statute in a takings case alleging inverse condemnation. ODNR argues that the applicable time limit is either two years pursuant to R.C. 2305.10 or four years pursuant to R.C.2305.09(D). The two-year statute pertains to claims for bodily injury, injury to personalty, and products liability claims. As such, the trial court correctly found that such statute is inapplicable. The four-year statute has a residual clause which applies to actions "[f]or an injury to the rights of the plaintiff not arising on contract nor enumerated in sections2305.10 to 2305.12, 2305.14 * * *." However, the trial court suggested that the applicable statute of limitations is contained in R.C. 2305.04, the adverse possession statute, which provides:
 "An action to recover the title to or possession of real property shall be brought within twenty-one years after the cause of action accrued * * *"
The Supreme Court has held that a proceeding to compel an appropriation of realty is not barred until twenty-one years from occupancy by the defendant. See, e.g., Webster v.Pittsburgh C. T. RR. Co. (1908), 78 Ohio St. 87; Fries v.Wheeling Lake Erie Ry. Co. (1897), 56 Ohio St. 135; LawrenceRR. Co. v. O'Harra (1891), 48 Ohio St. 343; Little Miami RR.Co. v. Hambleton (1884), 40 Ohio St. 496. The Tenth Appellate District has applied the twenty-one year statute of limitations to a plaintiff's case which sought to compel a city to commence appropriations proceedings. Consolidated Rail Corp. v. City ofGahanna (May 16, 1996), Franklin App. No. 95APE12-1578, unreported, citing State ex rel. A.A.A. Invests. v. Columbus
(1985), 17 Ohio St.3d 151, 152 (which held that government entities may adverse possess land).
Therefore, we find that the statute of limitations within which a plaintiff must bring an action to compel the government to appropriate property allegedly taken is twenty-one years. See, also, Annotation, State Statute of Limitations Applicable to Inverse Condemnation or Similar Proceedings by Landowner to Obtain Compensation for Direct Appropriation of Land without the Institution or Conclusion or Formal Proceedings against Specific Owner (1983), 26 A.L.R.4th 68, Section 6[a]. Since the complaint was filed well within this time period, ODNR's ninth assignment of error is without merit.
ODNR's first and second assignments of error state:
 "THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FOUND A `TAKING' WITHOUT A CORRESPONDING `STATE ACTION' BY ODNR."
 "THE TRIAL COURT ERRED IN FINDING A TAKING BASED ON ACTS OF PUBLIC EMPLOYEES OUTSIDE THEIR STATUTORY OR EXPRESS AUTHORITY."
The trial court determined that the taking by ODNR occurred on June 6, 1986, which is the date that the court found that OSM finished its project. ODNR claims that there is no evidence of any state action occurring on that date which would infer a taking. ODNR states that their only involvement was informing Chief Wallace that OSM was going to conduct an emergency project at the bowling alley, referring the case to OSM, and engaging in discussions on whether they should use their discretion to use state funds to buy appellees' property. ODNR claims that they have no authority to close private buildings and did not do so in this case.
Inverse condemnation is a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted. City of Cincinnati v. Chavez Properties
(1996), 117 Ohio App.3d 269, 274. Where a property owner claims that his property in fact has been taken by the state and that he has been damaged and appropriation proceedings have not been instituted, the property owner may proceed to seek a writ of mandamus to compel the initiation by the state of such appropriation proceedings. J. P. Sand Gravel Co. v. State
(1976), 51 Ohio App.2d 83, 89.
For a writ of mandamus to issue, a relator must demonstrate that (1) the relator has a clear legal right to the relief prayed for, (2) respondent is under a corresponding clear legal duty to perform the requested acts, and (3) relator has no plain and adequate legal remedy. State ex rel. ServiceEmployees Intern. Union, Dist. 925 v. State EmploymentRelations Bd. (1998), 81 Ohio St.3d 173, 176-77. In the instant case, Hardale would have a right to the requested relief and ODNR would be under a clear legal duty to commence appropriation proceedings only if Hardale demonstrates that the conduct of ODNR with respect to the premises amounted to a taking of the property.
The Fifth Amendment to the United States Constitution guarantees that private property shall not "be taken for public use, without just compensation." Similarly, Section 19, Article I of the Ohio Constitution provides that "[p]rivate property shall ever be held inviolate, but subservient to the public welfare. * * * [W]here private property shall be taken for public use, a compensation therefor shall first be made in money * * * and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner."
In order to establish a taking, a landowner must demonstrate a substantial or unreasonable interference with a property right. State ex rel. OTR v. Columbus (1996), 76 Ohio St.3d 203,207. Such an interference may involve the actual physical taking of real property, or it may include the deprivation of an intangible interest in the premises. Id.
A land use restriction may constitute a taking if it is not reasonably necessary for a substantial public purpose or it is unduly harsh on the landowner. Id. at 125. An unduly harsh regulation is one that denies the landowner all economically viable use of the land. Keystone Bituminous Coal Assn. v.DeBenedictis (1987), 480 U.S. 470, 485. However, "[i]n cases of either physical invasion of the land or the destruction of a fundamental attribute of ownership like the right of access, the landowner need not establish the deprivation of all economically viable uses of the land." State ex rel. BSWDevelopment Grp. v. City of Dayton (1998), 83 Ohio St.3d 338,342.
ODNR's conduct throughout its involvement with Riviera was sufficient to constitute a taking. There was evidence presented that ODNR ordered the closure of the property, that ODNR took exclusive control of the property, and that ODNR threatened to criminally prosecute Michaels if he attempted to reenter the property for any purpose. Even once the OSM project had been completed, ODNR continued to assert exclusive control over the property and denied Michaels the right to enter. In addition, Michaels, Malik, and Ney all testified that they had received directives from ODNR employees Strogh, Miller, or Sherman, but appellant failed to call these employees to refute this testimony.
In sum, appellees presented sufficient evidence that they were denied a fundamental attribute of ownership, namely the right of access. This denial of access clearly constitutes a substantial or unreasonable interference with a property right. Therefore, appellees established a "taking."
Accordingly, ODNR's first and second assignments of error are without merit.
ODNR's fourth assignment of error states:
 "THE TRIAL COURT ERRED BY IMPOSING A DUTY ON ODNR TO ACQUIRE THE BOWLING LANES BASED ON RESOLUTIONS BY THE BOARD OF UNRECLAIMED STRIP MINED LANDS."
The court found a taking by ODNR requiring just compensation; it did not say that the Board's resolutions were binding on ODNR. Moreover, the court's statement that ODNR, "determined it was their duty to pay compensation when it offered the plaintiffs three hundred eighty eight thousand dollars ($388,000.00) in 1995," was only made to place appellees' suit within the statute of limitations proposed by ODNR.
Accordingly, ODNR's fourth assignment of error is without merit.
ODNR's fifth and sixth assignments of error state:
 "THE TRIAL COURT ERRED IN NOT GRANTING ODNR'S MOTION TO DISMISS WHERE THE COMPLAINT FAILED TO STATE A CLAIM FOR RELIEF."
 "THE TRIAL COURT ERRED IN NOT GRANTING ODNR'S MOTION FOR SUMMARY JUDGMENT BECAUSE THERE EXISTED NO GENUINE ISSUE OF MATERIAL FACT."
ODNR argues that its motion to dismiss should have been granted because it correctly alleged that appellees failed to state a claim for relief due to the following: ODNR had no duty to fix the gas problem, Board resolutions are not mandatory, and ODNR did not cause the fire citation to be issued. ODNR argues that its summary judgment motion should have been granted because appellees set forth no evidence to show that ODNR had anything to do with OSM's reclamation project.
In Continental Ins, Co. v. Whittington (1994), 11 Ohio St.3d 150, [71 Ohio St.3d 150], 156, the Ohio Supreme Court held that:
 "any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were issues of fact supporting a judgment in favor of the party against whom the motion was made."
Even if the arguments in ODNR's motions are correct, they deal only with factual premises. The genuine issue for trial revolved around whether there was a taking of appellees' property which required just compensation through an appropriation proceeding. It is well-settled Ohio law that a landowner's remedy for a purported taking is to bring a mandamus action to compel the taker to commence appropriations proceedings. State ex rel. Levin v. Sheffield Lake (1994),70 Ohio St.3d 104, 108; State ex rel. Wilson v. Preston (1962),173 Ohio St. 203, 209-10. As set forth in the pretrial order signed by both parties, appellees' contested issue of fact is whether ODNR exercised control over the property to the exclusion of appellees and thus deprived appellees of all economic value to their property. Therefore, a disputed claim existed and these assignments of error are without merit.
ODNR's eighth assignment of error states:
 "THE TRIAL COURT ERRED BY APPLYING A `PHYSICAL TAKINGS' TEST TO A `REGULATORY TAKINGS' INQUIRY."
The trial court's opinion stated:
 "The questions presented to the court are as follows:
"* * *
 "(3) did the action of the defendant, the Ohio Department of Natural Resources displace the property owners from the space from which they were entitled to exercise domain? In other words, a taking of their property.
"* * *
 "The evidence clearly shows that the attempt of remedial action by the office of Surface Mining ended on June 6, 1986 and that the plaintiffs were physically displaced from the property in which they were entitled to exercise domain, that prior to the offer to purchase on April 17, 1996 the Ohio Department of Natural Resources acknowledged that they had taken control of the property and Mr. Robert Baker was more concerned about depleting his budget than the rights of the property owner protected by the Ohio and Federal Constitution." (Opinion at 2-3, 7-8)
ODNR argues that the test applied by the trial court was one applicable only to physical takings where the state exercises its power of eminent domain. ODNR states that they did not use the bowling alley for state purposes or prevent appellees from selling or renovating the property. ODNR claims that if there existed a taking it was a regulatory taking because the state merely placed restrictions on appellees' use of the land, citing Penn Cent. Transp. Co. v. New York City
(1978), 438 U.S. 104.
A physical taking does not require physical invasion but can also result from restraint or ouster. As previously stated, appellees testified that ODNR instructed them that they could not enter the premises even after OSM finished the project.
A land use restriction may constitute a taking if it is not reasonably necessary for a substantial public purpose or it is unduly harsh on the landowner. Id. at 125. An unduly harsh regulation is one that denies the landowner all economically viable use of the land. Keystone Bituminous Coal Assn. v.DeBenedictis (1987), 480 U.S. 470, 485. However, "[i]n cases of either physical invasion of the land or the destruction of a fundamental attribute of ownership like the right of access, the landowner need not establish the deprivation of all economically viable uses of the land." State ex rel. BSWDevelopment Grp. v. City of Dayton (1998), 83 Ohio St.3d 338,342. Moreover, the United States Supreme Court has eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and has relied instead on ad hoc, factual inquiries into the circumstances of each particular case. Connolly v. Pension Ben. Guar. Corp. (1986),475 U.S. 211.
Thus, ODNR's denial of access to appellees' property for a decade constitutes a taking requiring just compensation. However, the state need not provide compensation when it diminishes or destroys the value of land by abating a public nuisance. Keystone, supra, at 491-92. That issue is addressed next in ODNR's third and seventh assignments of error.
Accordingly, ODNR's eighth assignment of error is without merit.
ODNR's third and seventh assignments of error state:
 "THE TRIAL COURT ERRED IN FINDING THAT ODNR HAS A DUTY TO SPEND PUBLIC FUNDS ABATING METHANE GAS IN A PRIVATE BUILDING."
 "THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FOUND GOVERNMENTAL ACTION PREVENTING A NUISANCE TO BE A `TAKING'."
Appellees testified that after OSM completed their reclamation project and declared it a success with minor levels of methane gas remaining, ODNR continued to exercise dominion and control over the land to the exclusion of appellees. ODNR argued that any action they took was to abate a nuisance and constitutes an exception to the constitutional requirement of just compensation. In response, the trial court's opinion stated:
 "The court finds that thirteen (13) years is a long time to abate a nuisance especially when nothing has been done for the last twelve (12) years.
 "This court finds that the defendant's proposition that it entered on the property to abate a nuisance under the police power is without merit considering that the office of Surface Mining left the property July of 1986." (Opinion at 5)
On appeal, ODNR argues that a takings suit cannot be brought against a government whose actions were engaged in to abate a public nuisance, citing Lucas v. South Carolina CoastalCouncil (1992), 505 U.S. 1003 and Northern Ohio Sign Constrs.v. City of Lakewood (1987), 32 Ohio St.3d 316. They argue that a taking does not exist when property is ordered to be vacated or destroyed due to violations of state building, fire, or health codes. In the case at bar, a fire citation was originally issued ordering vacation of the premises. After the issuance of this citation, OSM claimed to have corrected the gas hazard. ODNR believed that a gas hazard still existed based upon a different set of tests. ODNR correctly posits that they had no duty to fix the methane gas problem. However, generally when a state acts to abate a public nuisance it files an action for an injunction. Such an action was never filed by ODNR. Moreover, when the state wishes to abate a public nuisance the landowner is usually allowed access to attempt to mitigate the nuisance. In this case, appellees were denied such access.
Accordingly, ODNR's third and seventh assignments of error are without merit.
The judgment of the trial court is hereby affirmed.
COX, J., concurs, WAITE, J., concurs.
APPROVED:
 ____________________ GENE DONOFRIO, JUDGE
[1] This body has since been renamed the Council on Unreclaimed Strip Mined Lands.