OPINION
{¶ 1} This action in mandamus is presently before this court for final disposition of respondents' motion for summary judgment as to each aspect of relator's remaining claim for relief. Under that single claim, relator essentially alleged that respondents had engaged in a series of twelve acts which ultimately resulted in the temporary regulatory taking of his real property. As the primary grounds for the instant motion, respondents *Page 2 
maintain that relator will never be able to satisfy the elements for a writ of mandamus because the undisputed evidence establishes that any delays in relator's proposed use of the subject land was due to his dilatory acts. Upon reviewing each side's respective evidentiary materials and the relevant case law, this court concludes that the granting of summary judgment is warranted under the specific facts of this case.
 {¶ 2} A review of the various evidentiary materials and original pleadings in this action readily indicates that the majority of the underlying facts are not in dispute. The ensuing synopsis of the basic subject matter of the case is based on those undisputed facts.
 {¶ 3} Beginning in 1984, relator, Richard A. Duncan, had taken steps to obtain a state liquor license so that he could operate a tavern in the Village of Middlefield, Ohio. After waiting for approximately seventeen years, he was finally given an indication that he would be awarded such a license. As a direct result, relator started to look at various properties located within the territorial limits of the village. Subsequently, in May 2001, he bought the subject land for the sole purpose of renovating the existing building into a bar and pool hall.
 {¶ 4} The real property in question was situated in a portion of the Village which was zoned for most commercial uses, including a tavern/pool hall. However, relator's property was only .58 acres in total size and had only ninety-five feet of frontage on the adjacent street. In addition, the property did not comply with certain other basic zoning requirements for a commercial real estate, such as side-yard and rear-yard setbacks. Similarly, certain aspects of the existing building did not satisfy the Village's ordinances concerning commercial structures. *Page 3 
 {¶ 5} Before relator could begin to make the necessary changes to the land and the building, he was obligated to submit his general plans for the establishment to two Village entities. First, in light of the foregoing peculiar characteristics of his land, he had to file an application for specific variances with the Village's Board of Zoning Appeals. After conducting only one hearing on relator's application, the Board of Zoning Appeals granted him all of the necessary variances for the project in October 2001. Second, he then had to present the specifications of his complete construction plans to the Village's Planning and Zoning Commission ("Commission").
 {¶ 6} As part of the proceedings before the Commission, relator was required to engage in a procedure referred to as the "site plan approval" process. Pursuant to this process, relator and his engineer had to submit the details of all planned changes to the property so that they could be reviewed by a separate engineer who was employed by the Commission. Once this review of the submitted plans took place, the Commission's engineer would provide relator with a list of all items which had to be altered or added prior to final approval. In turn, relator and his engineer would have to file new plans that addressed the cited items.
 {¶ 7} Beginning in December 2001, relator submitted at least four different plans for review. In responding to relator's first draft, the Commission's engineer stated in his correspondence that the plan had been deficient in relation to over one hundred items. Even though the number of cited deficiencies steadily lessened with the filing of each successive plan, relator and his engineer began to believe that the Commission and its engineer were raising bogus issues which were intended to delay the entire project. In fact, approximately five months after filing the first plan, it became necessary for relator *Page 4 
to hire a new engineer because his initial engineer had concluded that he would never be able to completely satisfy the Commission's engineer.
 {¶ 8} Of the various deficiencies stated in the Commission's correspondences, relator was able to adequately address the cited concerns with little effort. As to a few of the deficiencies, though, the items remained points of contention during the entire "site plan approval" process. The primary example of these major points of contention concerned the Commission's requirement regarding the drainage of storm water from the proposed parking lot on the land. It was the position of the Commission's engineer that any storm water had to be collected and pumped into the sewer line by the adjacent street. In response, relator and his engineers contended that the storm water should be allowed to naturally drain away from the street and across a neighboring property into a nearby lake. The two sides continued to argue about this point for several months, and the point was resolved only when the Commission relented and accepted the position of relator and his engineers.
 {¶ 9} The disputes concerning the requirements for relator's property continued for approximately six months until late June 2002. However, after he had hired a new engineer, relator was eventually able to satisfy all of the requirements for the renovation of his property. As a result, the Commission issued relator a zoning permit, under which he was given a thirty-month period to complete the changes to his property.
 {¶ 10} For various reasons, relator was unable to finish the proposed alterations to both the land and the existing structure within the thirty months. In fact, some of the necessary changes to the land, such as the installation of the parking lot, were not even started. Accordingly, in December 2004, he filed a request to extend the effectiveness *Page 5 
of his zoning permit for an additional nine months. After considering the request during an oral proceeding, the Commission granted relator an extension of time, but only for a period of five months until July 1, 2005.
 {¶ 11} While this extension was in effect, relator did hire Ronyak Brothers Paving to perform some of the remaining work on the land. However, due to some inclement weather and possible miscommunications with relator's engineer, the paving company did not even begin its aspect of the work prior to the deadline of July 1, 2005. Hence, it became necessary for relator to request a second extension of the zoning permit, which the Commission granted for thirty days. When relator and the paving company still had not completed the required work by the end of the second extension, the Commission allowed another extension of thirty days.
 {¶ 12} Although relator and the paving company were able to make substantial progress on the project during August 2005, they still could not totally compete all of the required work by the end of the third extension. At that point, relator again requested an additional extension of time, but the Commission decided to deny the new request and revoke the zoning permit. As part of its decision, the Commission informed relator that, because he had not been able to finish the project in over three years, it would now be necessary for him to comply with new county requirements pertaining to the drainage of storm water.
 {¶ 13} After waiting four months, relator submitted a new application for a zoning permit with the Commission. In relation to the vast majority of the requirements for the "tavern" project, relator was told that he would not be obligated to repeat the entire "site plan approval" process because he would be permitted to follow the prior specifications *Page 6 
for the work. However, as to the new "drainage" rules, his engineer was obligated to file plans to the Commission's engineer regarding the manner in which compliance could be achieved. At the conclusion of this three-month process, it was determined that relator could meet the new rules by installing a smaller drainage pipe in the existing system.
 {¶ 14} Once relator had complied with the "pipe" requirement and had corrected certain errors in the previous work of the paving company, the Village's zoning inspector issued an occupancy permit for the tavern. Consequently, relator's business was able to open in June 2006.
 {¶ 15} Prior to filing his second application for a zoning permit, relator brought the instant original action in this court. As the primary opposing parties in the case, relator's petition named the following public officials and entities as respondents: (1) the Village of Middlefield; (2) the Commission, along with its five individual members; and (3) the Village Council and its six individual members. Additionally, Ronyak Brothers Paving was named in the petition as an opposing party.
 {¶ 16} In regard to the paving company, relator's petition asserted only one claim for relief, which basically alleged that the company had breached its contract to perform specific work on the property. After filing an answer to the petition, the paving company moved to dismiss the sole claim on the grounds that this court did not have the requisite jurisdiction to review the merits of a "contract" claim in the context of an original action. In a separate judgment entry on the motion to dismiss, this court found the company's argument to be well taken; i.e., we held that, because a "contract" claim was not one of the five causes of action over which an appellate court had original jurisdiction under Section 3(B), Article IV of the Ohio Constitution, we lacked the authority to proceed as a *Page 7 
trial court in the final resolution of that matter. As a result, Ronyak Brothers Paving was dismissed as a party to the action.
 {¶ 17} As to the various "Village" respondents, relator asserted claims sounding in mandamus, trespass, estoppel, "interference" with the procurement of a license to sell liquor, and intentional infliction of emotional distress. Furthermore, relator's petition contained a separate claim for punitive damages against the "Village" respondents. As part of the judgment entry in which the sole "paving company" claim was dismissed, this court also held that, except as to the claim in mandamus, none of the foregoing claims as to the "Village" respondents could go forward before us because, again, they did not fall within the limited scope of our original jurisdiction. Regarding this point, our analysis in the prior judgment entry further stated that it would be possible to render a complete decision on the mandamus claim without having to make a ruling on the final merits of the other five claims.
 {¶ 18} In addition to ordering the dismissal of five of the six "Village" claims, this court's prior judgment entry reached the conclusion that two of the "Village" respondents were not proper parties to the case. Specifically, we determined that, because both the Village Council and the Planning and Zoning Commission were entities which could not be sued separately under Ohio law, it had been improper for relator to name them as distinct respondents. In light of this and the other specific rulings in the judgment entry, this court ultimately ordered that the instant action could be maintained only against the Village of Middlefield itself, the individual members of its Council, and the individual *Page 8 
members of the Commission.[1] Plus, even as to those respondents, the action could go forward only on relator's claim in mandamus.
 {¶ 19} As was noted above, relator's request for a writ of mandamus was based on the basic allegation that, during the entire time frame in which he was attempting to go forward with his "tavern" project, he was subjected to a number of acts which had the effect of temporarily depriving him of the use of his real property. According to relator, the Commission and other Village officials engaged in these disputed acts because they did not want him to open his business and were intentionally creating difficulties to delay the work. He further alleged that the officials harbored ill will against him because he had been successful in a prior legal action against the Village involving his use of other land. In other words, relator contended that the Village officials were creating needless disputes on the "tavern" project as a way of recouping the attorney fees which had been paid in defense of the prior legal action.
 {¶ 20} As to the type of damages he had suffered due to the temporary taking of his property, relator also stated in his petition that the delay in the opening of the tavern had cost him nearly nine months of lost business profits. In addition, he stated that he had incurred over $10,000 in unwarranted engineering fees as a direct consequence of the Commission's various acts. In light of this, relator maintained that he was entitled to a writ to compel the Village and the officials to commence an appropriation proceeding so that he could be reimbursed for the foregoing costs.
 {¶ 21} Of the twelve particular acts/events referenced by relator in support of his *Page 9 
mandamus claim, five of them allegedly occurred during the six-month period before he was awarded the original thirty-month zoning permit in June 2002. This specific group of acts/events took place during the "site plan approval" process, and included: (1) the dispute about whether relator needed to install a pump for the "storm water" drainage from the proposed parking lot; (2) the dispute about whether he should be allowed two curb cuts for entrances to, and exits from, the parking lot; (3) the dispute over whether he needed a new front-yard set-back variance because his proposed front yard would be only 20.61 feet, instead of 21 feet; (4) the dispute over whether he was required to have a rear-yard setback of fifty feet; and (5) the continuing dispute between his original engineer and the Commission's engineer, which ultimately caused his first engineer to quit the project.
 {¶ 22} Four of the referenced acts/events generally relate to the time period after relator was unable to complete the entire project by the end of the third extension in late August 2005. These four acts/events consisted of: (1) the Commission's refusal either to grant relator a full nine-month extension beginning in December 2004, or to grant him an additional thirty-day extension in August 2005; (2) the purported action of a Village employee in ordering Ronyak Brothers Paving not to perform any new work on the land as of August 29, 2005; (3) the dispute over whether relator should have been required to comply with new county regulations concerning the drainage of storm water from the property; and (4) the dispute over whether he was entitled to a variance so that he could place a ground sign in front of the business for advertisement purposes.
 {¶ 23} Unlike the foregoing nine acts/events noted by relator, the remaining three did not relate to any specific time frame. The last three included: (1) the alleged act of a *Page 10 
Village employee in trespassing inside relator's building; (2) the alleged presentment of Village bills for services which either did not relate to his specific property or were never rendered; and (3) an alleged notice from the Village that he was required to cut down the weeds in his rear yard.
 {¶ 24} In moving for summary judgment in relation to relator's entire mandamus cause of action, the remaining respondents in the case, including the Village itself, the Commission, and the named Village officials, have asserted one primary argument for our review. Essentially, respondents submit that even if the twelve acts/events cited by relator did happen, they were not legally sufficient to establish a temporary regulatory taking for which he would be entitled to compensation under both the Federal and Ohio Constitutions. Specifically, respondents maintain that the undisputed facts of this case establish that: (1) the periods of time in which the "tavern" project was delayed by the regulatory proceedings were relatively short; and (2) the main delays in the completion of the project were due to relator's own acts. In support of the first point, they note that the entire "site plan approval" process only took six months to complete. Regarding the second point, they emphasize that the majority of the delays during the initial approval process was caused by the fact that relator had to submit multiple plans in order to meet certain requirements which he did not challenge as being unnecessary.
 {¶ 25} Since relator's entire mandamus claim is predicated upon an allegation of a taking of real property, the extent of his right to the requested relief is governed by the Fifth Amendment to the United States Constitution and Section 19, Article I of the Ohio Constitution. Both of the provisions expressly forbid the government from taking any private property unless "just compensation" is given to the owner. Skiles v.Bellevue *Page 11 Dev. Corp., 6th Dist. No. S-07-015, 2008-Ohio-78, at ¶ 61. As a general proposition, the two provisions are not intended to place any limit upon the ability of the government to interfere with the property rights of a private citizen; instead, they only require the state to compensate the owner when the extent of the governmental interference, although still legally proper, rises to level of a taking. Lingle v. Chevron U.S.A.Inc. (2005), 544 U.S. 528, 537.
 {¶ 26} Under Ohio law, if the governmental entity refuses to acknowledge that an involuntary taking has occurred, the appropriate remedy for a property owner to pursue is a writ of mandamus. SeeCleveland v. Martin, 8th Dist. No. 85374, 2005-Ohio-6482, at ¶ 23. In such a case, if the existence of a taking is actually established, the writ will lie to compel the governmental entity to bring an appropriation proceeding in regard to the subject property. State exrel. BSW Dev. Group v. Dayton (1998), 83 Ohio St.3d 338, 341. The burden of proving the elements of a taking is upon the property owner as the relator in the action. State ex rel. Shemo v. Mayfield Hts., (2002),95 Ohio St.3d 59, 63.
 {¶ 27} The fundamental example of an involuntary taking involves the situation in which the governmental entity physically invades the property and, as a practical matter, ousts the owner from actual possession. Lingle, 544 U.S. at 537. However, beginning withPennsylvania Coal Co. v. Mahon (1922), 260 U.S. 393, the United States Supreme Court has recognized that a taking of property can also occur through the enforcement of governmental regulations concerning the use of land. Under this type of a taking, the state does not directly appropriate the land from the owner; rather, the regulation of the property becomes so onerous that its effect on the owner's rights is similar to an actual condemnation of the land. Skiles, 2008-Ohio-78, at ¶ 61. *Page 12 
 {¶ 28} Historically, courts have employed a two-part test for determining whether a landowner has been the victim of a regulatory taking; i.e., under this test, a finding of an involuntary taking could be made only when the regulation either failed to advance a legitimate state interest or deprived the owner of all economically viable use of the land. Cincinnati v. Chavez Properties (1996), 117 Ohio App.3d 269,275. As part of its basic holding in Lingle, 544 U.S. 528, the United States Supreme Court expressly concluded the "legitimate state interest" prong does not constitute a valid formula for deciding if a property owner has been subjected to a regulatory taking. The Lingle court also stated that, through the years, its prior precedent has referred to three categories of regulatory takings. Id., 544 U.S. at 538-539.
 {¶ 29} The existence of the three separate categories, and the separate tests for determining if a taking has taken place, has recently been recognized by the Supreme Court of Ohio. In State ex rel. ShellyMaterials, Inc. v. Clark Cty. Bd. of Commrs., 115 Ohio St.3d 337,2007-Ohio-5022, the property owner's mandamus claim was based on the assertion that an involuntary taking had occurred when the board of zoning appeals had denied a conditional-use permit for the mining of sand and gravel. In upholding the appellate court's decision to deny the writ, the Supreme Court started its discussion by referencing the general proposition that the enforcement of a governmental regulation will only be deemed a taking when the burden upon the property is considered onerous. Id., at ¶ 17. The Supreme Court then went on to note that the standard for determining the existence of a taking depends upon the nature of the regulatory taking:
 {¶ 30} "Two types of regulatory actions will be deemed to be per se takings for Fifth Amendment purposes: first, those government actions that cause an owner to *Page 13 
suffer a permanent physical invasion of property, see Loretto v.Teleprompter Manhattan CATV Corp. (1982), 458 U.S. 419, 435-440, * * *; and second, government regulations that completely deprive an owner of`all economically beneficial uses' of the property. * * * Lucas v. SouthCarolina Coastal Council (1992), 505 U.S. 1003, * * *. A Lucas taking is also known as a categorical, or total, taking, and in such a case, the government must pay just compensation for the total property taken except to the extent that `background principles of nuisance and property law' independently restrict the owner's intended use of the property. Id. at 1030. `"Outside these two relatively narrow categories (and the special context of land-use exactions * * *), regulatory takings challenges are governed by the standards set forth in Penn CentralTransp. Co. v. New York City, 438 U.S. 104, * * * (1978)." Lingle v.Chevron U.S.A., Inc. (2005), 544 U.S. 528, 538, * * *.'" (Footnote omitted.) Id., at ¶ 18.
 {¶ 31} As an aside, this court would emphasize that the foregoing statement in Shelly Materials as to the extent of the application of the "all economically viable uses" standard is consistent with the basic manner in which federal courts have applied the United States Supreme Court's precedent. That is, the "all economically viable uses" standard only applies if a "total" regulatory taking has been alleged; in all other types of regulatory takings, the Penn Cent. standard must be followed. See, e.g., Gonzalez v. Dallas City Planning Comm. (N.D., Texas 2007), Case No. 3:05-CV-1737-M, 2007 U.S. Dist., LEXIS 46520.
 {¶ 32} In the instant action, our review of relator's petition shows that it contained a general assertion that respondents' various acts had denied him "economically viable use of his land (totally and/or partially), * * *." However, in now responding to the present *Page 14 
motion for summary judgment, relator has not made any reference to a "total" regulatory taking of the subject property. Instead, relator has only asserted that the alleged taking was temporary in nature. As to this point, this court would further indicate that, in trying to provide a statement of the damages he has incurred as a result of the taking, relator's response does not refer to any decrease in the value of his land or the lack of any other viable use. Rather, he merely contends that he is entitled to recover his lost profits and the additional fees he incurred as a result of respondents' acts.
 {¶ 33} As was discussed above, the crux of relator's mandamus claim was that the acts of respondents had the effect of delaying his ultimate use of his property for the tavern/billiard hall. Given the nature of this general allegation and the limited nature of the damages sought by relator, this court concludes that the alleged taking in this case could only be characterized as a "temporary" deprivation of his ownership rights. As a result, we must now address the question of which standard must be applied when the alleged regulatory taking is temporary in nature.
 {¶ 34} Fortunately, our review of recent precedent shows that the United States Supreme Court has had the opportunity to consider this basic issue. In Tahoe-Sierra Preservation Council, Inc. v. TahoeRegional Planning Agency (2002), 535 U.S. 302, the planning agency imposed two moratoria which had the effect of prohibiting any further residential development adjacent to Lake Tahoe for a total period of thirty-two months. In maintaining that they were entitled to "just compensation" for the period in which they could not build on their respective parcels, the property owners argued that the act of enacting a temporary moratorium was sufficient, in and of itself, to establish a per se categorical taking of the land. Specifically, the property owners asserted that a *Page 15 
regulatory taking had occurred because they had been denied all economically viable uses of their parcels while the moratoria were in place.
 {¶ 35} In rejecting the foregoing argument, the United States Supreme Court first emphasized that, in determining whether the enforcement of a regulation constitutes a taking in a particular instance, a person's ownership rights should not be divided into discrete segments, temporal or otherwise; instead, the person's rights in a parcel must be viewed as a whole in considering the extent to which the regulation interferes with the enjoyment of those rights. Second, the Court indicated that the "all economically viable use" standard was only intended to apply in extraordinary circumstances in which the regulation has the effect of eliminating the total value of a fee simple title. Third, in regard to whether a temporary moratorium should be treated as a categorical taking, the Court summarized its conclusion in the following manner:
 {¶ 36} "In our view the answer to the abstract question whether a temporary moratorium effects a taking is neither `yes, always' nor `no, never'; the answer depends upon the particular circumstances of the case. Resisting `the temptation to adopt what amount to per se rules in either direction,' Palazzolo v. Rhode Island, 533 U.S. 606,636, * * * (2001) (O'CONNOR, J., concurring), we conclude that the circumstances in this case are best analyzed within the Penn Central framework." [Footnote omitted.] Id., at 321.
 {¶ 37} Given this court's prior conclusion in the present matter that the purported taking of relator's property can only be characterized as temporary in nature, we further hold that the "all economically viable use" standard cannot be applied in determining if a taking actually occurred in this instance. Rather, the Tahoe-Sierra opinion dictates that the Penn Central standard is controlling. *Page 16 
 {¶ 38} In Shelley Materials, 2007-Ohio-5022, at ¶ 19, the Supreme Court of Ohio paraphrased the Penn Cent. standard in the following way:"Penn Cent. recognizes an ad hoc, factual inquiry that requires the examination of the following three factors to determine whether a regulatory taking occurred in cases in which there is no physical invasion, and the regulation deprives the property of less than 100 percent of its economically viable use: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. [Penn Cent., 438 U.S. 104, 124]."
 {¶ 39} Of the cited three factors, the third raises a point which is most pertinent to the facts of the instant matter. Our consideration of relator's factual assertions and legal arguments shows that he has not challenged the basic propriety of the process for site plan approval. Instead, relator has maintained that the process was not applied to his project in the same manner which is normally employed by the Commission. That is, he asserts that the Commission and its engineer treated him in bad faith by creating bogus issues to delay the start of his project and to increase his expenses. He further asserts that certain Village officials hoped to sabotage the "tavern" project as a way of obtaining revenge for a prior lawsuit he had pursued against the Village.
 {¶ 40} In a proper "regulatory taking" action, the crux of the landowner's claim is that the municipality's enforcement of a valid law or regulation has harmed the value of his land by restricting the manner in which the land can be used. Although the decision of the municipality to enforce the regulation in a particular way could be characterized as legally "wrong" under the facts of a given situation, there is usually no allegation that *Page 17 
the municipality denied the landowner his basic right to due process. By contending in this case that the Commission was creating bogus reasons to delay the onset of his project, relator is essentially asserting that he was denied due process; i.e., he is alleging that the Commission did not apply the normal criteria in ruling on the propriety of his site plans, but instead based its decisions upon the personal animosity of its individual members. To this extent, the alleged nature of the Commission's behavior was inherently different than the type of governmental actions which typically form the grounds of a regulatory taking.
 {¶ 41} A similar analysis applies to the first Penn Central factor, which focuses upon the economic impact of the regulation on the property owner. In the usual "taking" scenario, the enforcement of the regulation has the effect of decreasing the value of the land itself. However, in this instance, relator has not made any reference in either his response or his affidavit to the value of his land during the two periods in which he was subject to the "site plan approval" process. Instead, in describing the exact nature of his alleged damages, relator has cited only his lost profits and additional engineering fees. Even though these two types of damages may be recoverable in an appropriation case when the "taking" claim is predicated upon a decrease in the value of the subject land, this court concludes that it is illogical to base a finding of a taking solely upon those two types of damages. Accordingly, we hold that, like the third factor in the Penn Central standard, the first factor is not entitled to any weight in relator's favor in determining if a taking took place.
 {¶ 42} For purposes of this discussion, the last Penn Central factor measures the extent to which the landowner's investment-backed expectations have been harmed by *Page 18 
the regulation's enforcement. Given relator's reference to possible lost profits as part of the second period in which he was subject to the "site plan approval" process, there is some evidence before this court indicating that the Commission's denial of an additional extension under the original zoning permit delayed relator's ability "to make money" off of his investment in the subject property. However, even pursuant to relator's own version of the underlying facts, this delay did not have any lasting effect upon the profitability of the land; i.e., the delay only lasted nine months and relator was ultimately able to open the tavern for business.
 {¶ 43} In light of the limited time span covered by the second "site plan approval" process, this court also concludes that the secondPenn Central factor does not weigh in favor of a finding of a taking. That is, given that the overall profitability of the subject land remained generally the same despite the nine-month delay, relator's investment-backed expectations were not harmed to any significant degree. In turn, it follows that, even though relator presented sufficient evidence to create a factual dispute concerning whether he sustained lost profits, the existence of that dispute does not foreclose the granting of summary judgment under Civ.R. 56(C) because the dispute pertains to a fact which is immaterial to our Penn Central analysis.
 {¶ 44} Under relator's own factual allegations and evidentiary materials, the sole reason for the delay in the completion of his "tavern" project was the bad faith actions on the part of the Village's Commission. First, he claims the Commission created bogus reasons for rejecting his original plans during the first phase of the "site plan approval" process. Second, he claims the Commission created a new bogus reason for not granting him an additional extension and requiring him to go through a second period of *Page 19 
site plan approval. Given the nature of his factual assertions, logic dictates that relator cannot demonstrate that the land in question was subject to a regulatory taking which would entitled him to just compensation under the Federal and Ohio Constitutions. Rather, if his allegations are ultimately found to be believable, they could only establish a violation of his basic right to due process of law. Under such circumstances, relator's proper remedy would be a constitutional rights claim under Section 1983 of Title 42 of the United States Code. That claim is not before this court.
 {¶ 45} To be entitled to summary judgment under Civ.R. 56(C), the moving party in this type of civil exercise must be able to demonstrate that: "(1) there are no genuine factual disputes remaining to be litigated; (2) [the moving party] is entitled to judgment as a matter of law; and (3) the evidentiary materials are such that, even when those materials are interpreted in a way which is most favorable to the non-moving party, a reasonable person could only come to a conclusion adverse to the non-moving party." Sper v. Gansheimer, 11th Dist. No. 2003-A-0124, 2004-Ohio-2443, at ¶ 7. Upon fully reviewing the evidentiary materials of both sides, this court holds that respondents have satisfied each prong of the foregoing standard in relation to relator's entire mandamus claim. First, although there remains a factual dispute concerning whether respondents acted in bad faith, the resolution of that dispute is not material under the Penn Central
analysis; as to all of the material underlying facts, there are no genuine factual disputes. Second, in considering those undisputed facts in light of the three factors in the Penn Central test, we conclude that, as a matter of law, relator cannot show that respondents' actions resulted in a taking of the subject land. That is, given the nature of the alleged bad-faith acts and relator's resulting damages, he could only establish that he may have *Page 20 
been denied his right to due process. Therefore a reasonable person could only find that, because no taking of real property has occurred, relator is not entitled to a writ to compel the filing of an appropriation proceeding.
 {¶ 46} Consistent with the foregoing discussion, respondents' summary judgment motion is granted. It is the order of this court that the writ is denied, and that judgment is hereby rendered in favor of respondents as to relator's entire mandamus claim.
MARY JANE TRAPP, J., concurs,
COLLEEN MARY OTOOLE, J., dissents.
[1] For the sake of brevity, the phrase "the Commission" has been employed in this judgment entry to refer to the collective acts of the individual members of the Planning and Zoning Commission, notwithstanding the fact that the Commission itself has been fully dismissed as a respondent in the proceeding. *Page 1